### THORINGTON v. SMITH.

1. A contract for the payment of Confederate States treasury notes, made between parties residing within the so-called Confederate States, can be enforced in the courts of the United States, the contract having been made on a sale of property in the usual course of business, and not for the purpose of giving currency to the notes or otherwise aiding the . rebellion.
2. Evidence may be received that a contract payable in those States, during the rebellion, in "dollars," was in fact made for the payment in Confederate dollars.
3. The party entitled to be paid in these Confederate dollars can only receive their actual value at the time and place of the contract, in lawful money of the United States.

APPEAL from the District Court for the Middle District of Alabama, the case being this:

In November, 1864, Thorington being the owner of a piece of land adjoining the city of Montgomery, Alabama, sold it to Smith and Hartley, all parties being then resident of Montgomery. At the time of this sale the late rebellion was still in active operation and had been so for more than three years. Alabama, or this part of it, was at the time in the occupation of the military and civil authorities of the rebel States, and the Federal government exercised no authority there. There was no gold or silver coin in use, nor any notes of the United States, such as made the circulation

of the loyal portion of the country. The only currency in any ordinary use, or in which current daily business could be at all carried on, were treasury notes of the Confederate States, notes in form and general aspect like bank bills, and by which the Confederate States of America promised to pay the bearer the sum named in them, "two years after the ratification of a treaty of peace between the Confederate States and the United States of America."

"The whole State of Alabama," said the testimony in the case, "was in a revolutionary condition, politically and financially. The value of all kinds and species of property was changing from week to week, and from day to day, and there was no standard of value for property. A large advance frequently took place in the price of property of different kinds within a day or two, say one hundred to two hundred per cent. Speculation pervaded the whole community, and individuals asked whatever they thought proper for any and everything they had to sell. There was no standard value or regular price for real estate at the time mentioned. Prices changed with the fortunes of war. As the prospects grew dark the prices advanced. While, however, the Confederate States treasury notes were the general and really the only currency used in the common transactions of business, there were occasional instances where sales of property were made on the basis of gold and of notes of the United States."

The Confederate notes, though in fact imposed upon the people of the Confederate States, by its government, were never declared by it to be a legal tender.

The price agreed to be paid by Smith and Hartley, for the land which they purchased was $45,000. Of this sum $35,000 were paid at the execution of the deed in Confederate States treasury notes; and for the residue a note was executed thus:

$10,000.                    MONTGOMERY, November 28th, 1864.

*One day after date*, we, or either of us, promise to pay Jack Thorington, or bearer, ten thousand *dollars*, for value received

in real estate, sold and delivered by said Thorington to us this day, as per his deed to us of this date: this note, part of .the same transaction, is hereby declared as a lien or mortgage on said real estate situate and adjoining the city of Montgomery.

W. D. SMITH.

J. H. HARTLEY.

The rebellion being suppressed in 1865, the Confederate States treasury notes became, of course, worthless, and Thorington, in 1867, filed a bill in the court below against. his purchasers, who were still in possession, for the enforce- -ment of the vendor's lien, claiming the $10,000 in the only money now current, to wit, lawful money of the United States.

The answer set up, by way of defence, that the negotiation for the purchase of the land took place, and that the note in controversy was made, at Montgomery, in the State of Alabama, where all the parties resided, in November, 1864, at which time the authority of the United States was ex- cluded from that portion of the State, and the only currency in use consisted of Confederate treasury notes, issued and put in circulation by the persons exercising the ruling power of the States in rebellion, known as the Confederate govern- ment.

It was also insisted that the land purchased was worth no more than $3000 in lawful money; that the contract price was $45,000; that this price, by the agreement of the par- ties, was to be paid in Confederate notes; that $35,000 were actually paid in those notes; and that the note given for the remaining $10,000 was to be discharged in the same manner;. and it was asserted on this state of facts, that the vendor was entitled to no relief in a court of the United States.

On the hearing below, a witness, who negotiated the sale of the land, was offered to show that it was agreed and under- stood that the note should be paid in Confederate States treasury notes, as the $35,000 had been. This witness de- scribed the note, however, as one payable at thirty days.

The court below, admitting the evidence to prove that the

note was in fact made· for payment in Confederate States treasury notes, and sustaining, apparently, the view of the purchasers that the contract was illegal because to be paid in such notes, dismissed the bill.

The questions before this court upon the appeal, were these :

1. Can a contract for the payment of Confederate notes, made during the late rebellion, between parties residing within the so-called Confederate States, be enforced at all in the courts of the United States ?

2. Can evidence be received to prove that a promise expressed to be for the payment of dollars was, in fact, made for the payment of any other than lawful dollars of the United States ?

3. Did the evidence establish the fact that the note for ten thousand dollars was to be paid, by agreement of the parties, in Confederate notes ?

A point as to the measure of damages was also raised at the bar.

The case was twice argued.

*Mr. P. Phillips, for the appellant (a brief of Mr. Chilton being filed) :*

1. There is no reason to suppose that the contract was entered into for the *purpose* of giving currency to the Confederate notes, and thus aiding the rebellion. And the question is not whether the issuing of these notes was illegal, but whether an agreement to receive them in payment of property, made the contract between the parties illegal. If there was no illegal design, the contract was not immoral.* The contract, therefore, was legal.

The only question is, what must we hold it to mean. ·

The note now here on its face is clear and distinct. The promise to pay " ten thousand· dollars " has a well-understood, well-defined meaning. Whether made in Massachusetts or Alabama the rules applicable to its construction are

---

* Orchard *v.* Hughes, 1 Wallace, 75.

the same. The issue presented by the answer is, that this contract did not represent the truth; that, in point of fact, the agreement was for a payment in an *illegal currency* of a mere nominal value. It is difficult to conceive of a more palpable contradiction of the legal effect of a contract than the admission of evidence to sustain this defence.

The cases are numerous where the struggle has been made to introduce parol evidence to explain the meaning of words, regarded by the court of doubtful import: such as "current funds," "current bank notes," "currency." But where, as in this case, a party has promised to pay so many "dollars," no authority will sanction evidence of an agreement that dollars meant not what the law says it meant, but something very different, to wit, Confederate treasury notes. All the authorities are the other way.[*]

2. This question, as applicable to the condition of things set up in the answer, was considered in *Roane* v. *Green,*[†] the court holding that it was not competent to prove by parol, on such a note, that Confederate treasury notes was the payment agreed on. In fact, as these notes were never made a legal tender by the rebel government nothing but coin would, even under *it,* be a discharge of the debt.

Indeed in all these cases of alleged contemporaneous agreements, it may be asked why the verbal condition, if bargained for, was not put in writing also? If the rest of the agreement was sufficiently important to authorize written evidence of its execution, why except the remainder? The obvious inference must be, that all that the parties did in fact agree to was put in due written form, and that all collaterals and appendages, concerning which there was mere conversation, was precisely what they could not agree upon. This, of course, is not always the true inference, but it is of necessity the legal inference.

3. The parol evidence offered, if competent, is insufficient.

---

[*] Baugh *v.* Ramsey, 4 Monroe, 155; Pack *v.* Thomas, 13 Smeedes & Marshall, 11; Williams *v.* Beazley, 3 J. J. Marshall, 577; Morris *v.* Edwards, 1 Ohio, 189.

[†] 24 Arkansas, 212.

There was but one witness, and he misdescribes the note in one feature of it, the time namely that it had to run : a most important feature in view of the changes in values at the time when the note was given.

4. Another point not raised below, perhaps, but to which, if the court should think that the contract can be enforced, but not payment demanded in our now recognized currency, we would direct attention, is this. Confederate money is now wholly worthless. Payment in it is no payment at all. What, then, is the measure of damages? The peculiar circumstances of this case perhaps take it out of the rule announced in *Thompson* v. *Riggs*,* that the value of the money at the time the note was payable is the criterion. The value of gold as marked by these treasury notes, fluctuated daily and hourly, and was different in different parts of the State. While it was 20, 30, or 40 to 1, these treasury notes had an exchangeable power of 2, 3, or 4 to 1 in the different species of property. It may well be that the vendor should have agreed that if the note was paid at maturity, it might be extinguished in these notes; but it by no means follows that in default of payment he was willing to be compensated by the value of these notes in gold.

If, therefore, the date of the maturity of the note is adopted for the purpose of ascertaining the damage, the measure should be, not the value as compared to gold, but rather its relative value in property.

*No opposing counsel on either argument.*

The CHIEF JUSTICE delivered the opinion of the court.

The questions before us upon this appeal are these :

(1.) Can a contract for the payment of Confederate notes, made during the late rebellion, between parties residing within the so-called Confederate States, be enforced at all in the courts of the United States?

(2.) Can evidence be received to prove that a promise expressed to be for the payment of dollars was, in fact, made

---

* 5 Wallace, 663.

for the payment of any other than lawful dollars of the United States?

(3.) Does the evidence in the record establish the fact that the note for ten thousand dollars was to be paid, by agreement of the parties, in Confederate notes?

The first question is by no means free from difficulty. It cannot be questioned that the Confederate notes were issued in furtherance of an unlawful attempt to overthrow the government of the United States, by insurrectionary force. Nor is it a doubtful principle of law that no contracts made in aid of such an attempt can be enforced through the courts of the country whose government is thus assailed. But, was the contract of the parties to this suit a contract of that character? Can it be fairly described as a contract in aid of the rebellion?

In examining this question the state of that part of the country in which it was made must be considered. It is familiar history, that early in 1861 the authorities of seven States, supported, as was alleged, by popular majorities, combined for the overthrow of the National Union, and for the establishment, within its boundaries, of a separate and independent confederation. A governmental organization, representing these States, was established at Montgomery in Alabama, first under a provisional constitution, and afterwards under a constitution intended to be permanent. In the course of a few months, four other States acceded to this confederation, and the seat of the central authority was transferred to Richmond, in Virginia. It was, by the central authority thus organized, and under its direction, that civil war was carried on upon a vast scale against the government of the United States for more than four years. Its power was recognized as supreme in nearly the whole of the territory of the States confederated in insurrection. It was the actual government of all the insurgent States, except those portions of them protected from its control by the presence of the armed forces of the National government.

What was the precise character of this government in contemplation of law?

It is difficult to define it with exactness. Any definition that may be given may not improbably be found to require limitation and qualification. But the general principles of law relating to *de facto* government will, we think, conduct us to a conclusion sufficiently accurate.

There are several degrees of what is called *de facto* government.

Such a government, in its highest degree, assumes a character very closely resembling that of a lawful government. This is when the usurping government expels the regular authorities from their customary seats and functions, and establishes itself in their place, and so becomes the actual government of a country. The distinguishing characteristic of such a government is, that adherents to it in war against the government *de jure* do not incur the penalties of treason; and under certain limitations, obligations assumed by it in behalf of the country, or otherwise, will, in general, be respected by the government *de jure* when restored.

Examples of this description of government *de facto* are found in English history. The statute 11 Henry VII, c. 1,* relieves from penalties for treason all persons who, in defence of the king, for the time being, wage war against those who endeavor to subvert his authority by force of arms, though warranted in so doing by the lawful monarch.†

But this is where the usurper obtains actual possession of the royal authority of the kingdom: not when he has succeeded only in establishing his power over particular localities. Being in possession, allegiance is due to him as king *de facto*.

Another example may be found in the government of England under the Commonwealth, first by Parliament, and afterwards by Cromwell as Protector. It was not, in the contemplation of law, a government *de jure*, but it was a government *de facto* in the most absolute sense. It incurred obligations and made conquests which remained the obligations and conquests of England after the restoration.

---

* 2 British Stat. at Large, 82.      † 4 Commentaries, 77.

The better opinion doubtless is, that acts done in obedience to this government could not be justly regarded as treasonable, though in hostility to the king *de jure.* Such acts were protected from criminal prosecution by the spirit, if not by the letter, of the statute of Henry the Seventh. It was held otherwise by the judges by whom Sir Henry Vane was tried for treason,* in the year following the restoration. But such a judgment, in such a time, has little authority.

It is very certain that the Confederate government was never acknowledged by the United States as a *de facto* government in this sense. Nor was it acknowledged as such by other powers. No treaty was made by it with any civilized state. No obligations of a National character were created by it, binding after its dissolution, on the States which it represented, or on the National government. From a very early period of the civil war to its close, it was regarded as simply the military representative of the insurrection against the authority of the United States.

But there is another description of government, called also by publicists a government *de facto,* but which might, perhaps, be more aptly denominated a government of paramount force. Its distinguishing characteristics are (1), that its existence is maintained by active military power, within the territories, and against the rightful authority of an established and lawful government; and (2), that while it exists, it must necessarily be obeyed in civil matters by private citizens who, by acts of obedience, rendered in submission to such force, do not become responsible, as wrongdoers, for those acts, though not warranted by the laws of the rightful government. Actual governments of this sort are established over districts differing greatly in extent and conditions. They are usually administered directly by military authority, but they may be administered, also, by civil authority, supported more or less directly by military force.

One example of this sort of government is found in the case of Castine, in Maine, reduced to British possession during

---

* 6 State Trials, 119.

the war of 1812. From the 1st of September, 1814, to the ratification of the treaty of peace in 1815, according to the judgment of this court in *United States* v. *Rice*,* "the British government exercised all civil and military authority over the place." "The authority of the United States over the territory was suspended, and the laws of the United States could no longer be rightfully enforced there, or be obligatory upon the inhabitants who remained and submitted to the conqueror. By the surrender, the inhabitants passed under a temporary allegiance to the British government, and were bound by such laws, and such only, as it chose to recognize and impose." It is not to be inferred from this that the obligations of the people of Castine as citizens of the United States were abrogated. They were suspended merely by the presence, and only during the presence, of the paramount force. A like example is found in the case of Tampico, occupied during the war with Mexico by the troops of the United States. It was determined by this court, in *Fleming.* v. *Page,*† that, although Tampico did not become a port of the United States in consequence of that occupation, still, having come, together with the whole State of Tamaulipas, of which it was part, into the exclusive possession of the National forces, it must be regarded and respected by other nations as the territory of the United States. These were cases of temporary possession of territory by lawful and regular governments at war with the country of which the territory so possessed was part.

The central government established for the insurgent States differed from the temporary governments at Castine and Tampico in the circumstance, that its authority did not originate in lawful acts of regular war, but it was not, on that account, less actual or less supreme. And we think that it must be classed among the governments of which these are examples. It is to be observed that the rights and obligations of a belligerent were conceded to it, in its military character, very soon after the war began, from motives

---

* 4 Wheaton, 253.    † 9 Howard, 614.

of humanity and expediency by the United States.    The whole territory controlled by it was thereafter held to be enemies' territory, and the inhabitants of that territory were held, in most respects, for enemies.    To the extent, then, of actual supremacy, however unlawfully gained, in all matters of government within its military lines, the power of the insurgent government cannot be questioned.    That supremacy did not justify acts of hostility to the United States.    How far it should excuse them must be left to the lawful government upon the re-establishment of its authority. But it made obedience to its authority, in civil and local matters, not only a necessity but a duty.    Without such obedience, civil order was impossible.

It was by this government exercising its power throughout an immense territory, that the Confederate notes were issued early in the war, and these notes in a short time became almost exclusively the currency of the insurgent States. As contracts in themselves, except in the contingency of successful revolution, these notes were nullities; for, except in that event, there could be no payer.    They bore, indeed, this character upon their face, for they were made payable only " after the ratification of a treaty of peace between the Confederate States and the United States of America."    While the war lasted, however, they had a certain contingent value, and were used as money in nearly all the business transactions of many millions of people.    They must be regarded, therefore, as a currency, imposed on the community by irresistible force.

It seems to follow as a necessary consequence from this actual supremacy of the insurgent government, as a belligerent, within the territory where it circulated, and from the necessity of civil obedience on the part of all who remained in it, that this currency must be considered in courts of law in the same light as if it had been issued by a foreign government, temporarily occupying a part of the territory of the United States.    Contracts stipulating for payments in this currency, cannot be regarded for that reason only, as made in aid of the foreign invasion in the one case, or of the

domestic insurrection in the other. · They have no necessary
relations to the hostile government, whether invading or
insurgent. · They are transactions in the ordinary course
of civil society, and, though they may indirectly and re-
motely promote the ends of the unlawful government, are
without blame, except when proved to have been entered
into with actual intent to further invasion or insurrection.
We cannot doubt that such contracts should be enforced in
the courts of the United States, after the restoration of peace,
to the extent of their just obligation. The first question,
therefore, must receive an affirmative answer.

The second question, Whether evidence can be received
to prove that a promise, made in one of the insurgent States,
and expressed to be for the payment of dollars, without
qualifying words, was in fact made for the payment of any
other than lawful dollars of the United States? is next to be
considered.

· It is quite clear that a contract to pay dollars, made be-
tween citizens of any State of the Union, while maintaining
its constitutional relations with the National government, is
a contract to pay lawful money of the United States, and
cannot be modified or explained by parol evidence. But it
is equally clear, if in any other country, coins or notes
denominated dollars should be authorized of different value
from the coins or notes which are current here under that
name, that, in a suit upon a contract to pay dollars, made
in that country, evidence would be admitted to prove what
kind of dollars were intended, and, if it should turn out that
foreign dollars were meant, to prove their equivalent value
in lawful money of the United States. Such evidence does
not modify or alter the contract. It simply explains an
ambiguity, which, under the general rules of evidence, may
be removed by parol evidence.

We have already seen that the people of the insurgent
States, under the Confederate government were, in legal
contemplation, substantially in the same condition as inhabi-
tants of districts of a country occupied and controlled by an

invading belligerent. The rules which would apply in the former case would apply in the latter; and, as in the former case, the people must be regarded as subjects of a foreign power, and contracts among them be interpreted and enforced with reference to the conditions imposed by the conqueror, so in the latter case, the inhabitants must be regarded as under the authority of the insurgent belligerent power actually established as the government of the country, and contracts made with them must be interpreted and enforced with reference to the condition of things created by the acts of the governing power.

It is said, indeed, that under the insurgent government the word dollar had the same meaning as under the government of the United States; that the Confederate notes were never made a legal tender, and, therefore, that no evidence can be received to show any other meaning of the word when used in a contract. But, it must be remembered that the whole condition of things in the insurgent States was matter of fact rather than matter of law, and, as matter of fact, these notes, payable at a future and contingent day, which has not arrived and can never arrive, were forced into circulation as dollars, if not directly by the legislation, yet indirectly and quite as effectually by the acts of the insurgent government. Considered in themselves, and in the light of subsequent events, these notes had no real value, but they were made current as dollars by irresistible force. – They were the only measure of value which the people had, and their use was a matter of almost absolute necessity. And this use gave them a sort of value, insignificant and precarious enough it is true, but always having a sufficiently definite relation to gold and silver, the universal measures of value, so that it was always easy to ascertain how much gold and silver was the real equivalent of a sum expressed in this currency. In the light of these facts it seems hardly less than absurd to say that these dollars must be regarded as identical in kind and value with the dollars which constitute the money of the United States. We cannot shut our eyes to the fact that they were essen-

tially different in both respects; and it seems to us that no rule of evidence properly understood requires us to refuse, under the circumstances, to admit proof of the sense in which the word dollar is used in the contract before us. Our answer to the second question is, therefore, also in the affirmative. We are clearly of opinion that such evidence must be received in respect to such contracts, in order that justice may be done between the parties, and that the party entitled to be paid in these Confederate dollars can recover their actual value at the time and place of the contract, in lawful money of the United States.

We do not think it necessary to go into a detailed examination of the evidence in the record in order to vindicate our answer to the third question. It is enough to say that it has left no doubt in our minds that the note for ten thousand dollars, to enforce payment of which suit was brought in the Circuit Court, was to be paid, by agreement of the parties, in Confederate notes.

It follows that the decree of the Circuit Court must be REVERSED, and the cause remanded, for further hearing and decree, in conformity with this opinion.