HEARD NOVEMBER TERM, 1877.

### STATE OF SOUTH CAROLINA vs. MOSELEY.

On 17th of July, 1863, a Sheriff received on an execution in his office which was not under stay, and about which no instructions had been given by the plaintiff as to the kind of currency in which it should be paid, payment in Confederate currency : *Held*, That the execution was satisfied and that the Sheriff was not liable for receiving the Confederate currency.

In the absence of specific instructions to the contrary, a Sheriff may always receive payment of an execution in the then common currency of the country.

### BEFORE MACKEY, J., AT LAURENS, SEPTEMBER, 1877.

This was an action in the name of the State of South Carolina against George F. Moseley, Sheriff, and the sureties on his official bond.

The case is fully stated in the opinion of the Court.

*Evins & Baxter*, for appellants:

I. The Sheriff is exclusively an executive officer of the Court, without either administrative or judicial functions or duties. His only duty in the case of B. F. Cleveland against Samuel Flemming was to execute the writ of *fieri facias* according to its terms and exigency, wherein he was not the agent of the parties and without discretion.—*Thomas Griffin and Hugh Ervin* vs. *Robert Thompson*, 2 How., 244; *Farrow & Hayes* vs. *Wingate*, 4 S. C., 35.

II. By the writ of execution the Sheriff is commanded to collect so many dollars, meaning gold and silver dollars.—*Given* vs. *Breedlove*, 2 How., 39; *Rice* vs. *McClintock*, Dud., 356.

III. If the Sheriff should be held to be the agent of the parties plaintiff, the writ of execution limits the scope of his agency, and he would be held responsible for his collections made thereunder in good money, as any other agent would be with limited authority.—*Hand* vs. *Smith*, 7 Wall., 452; *Mangum* vs. *Ball*, 5 Am. R., 493; 43 Miss., 288.

IV. The writ of execution required the collection of good money, and the Sheriff's entry of satisfaction is in accordance therewith, behind which the Sheriff should not be allowed now to go.

*Ball & Ferguson*, contra:

1. The Sheriff is bound to execute a writ addressed to him, according to its mandate, or according to plaintiff's instructions.—*Swansy* vs. *Hunt, Sheriff*, 2 N. & McC., 211; *Farrow & Hayes* vs. *Wingate*, 4 Rich., 35; *Perry* vs. *Williams & Jones*, 1 Bail., 10; *Farr* vs. *Sims*, Rich. Eq. Ca., 122; *Rice* vs. *McClintock*, Dud., 354.

In the case of *Farr* vs. *Sims*, O'Neall, J., delivering the opinion of the Court, says: "It is true every creditor has a right to demand and coerce payment in specie; but this, like all other legal rights, must be exercised in good faith, and not with a view of sacrificing a debtor's property, and thus obtain an unconscientious advantage. Every one to whom a debt is due has a right to be paid; but if this legal right is used to obtain the debtor's property at enormous sacrifices, this might be considered as a fraudulent abuse of the rights of the creditor and the debtor and might avoid the transaction."

2. A Sheriff is the agent of the plaintiff in execution, to perform in good faith its mandate, and, the mandate being to collect money, the collection of Confederate currency is a compliance with the mandate.—3 Mass., 405; 14 Mass., 122; 2 N. H., 333; 17 Mass., 560.

In the above cases it is decided that bank notes, negotiable notes and promissory notes, for many purposes, are considered as money.

3. In times of great embarrassment an agent will not be held to the strict accountability demanded in ordinary times, and he is not liable for depreciated currency which perished in his hands.—*Bellinger, Executor of Scottowe*, vs. *Gervais*, 1 DeS. Rep., 174.

This case was heard in 1790 by Chancellors Hutson and Matthews, and they say: "This case related to the settlement of the affairs of the late Mr. Scottowe, which had been in the hands of Mr. Gervais, as his agent, during the war. The principal question related to some depreciated paper money which sunk in his hands. The Court was of opinion that as the defendant swore positively he never had applied to his own use any of the money received for Scottowe he ought not to be accountable for it in any other way than the depreciated paper in his hands. He could not loan it during the war, and the times were such as to embarrass every man in deciding what was best to be done with funds."

Chancellor Matthews adds: "That the above be the standing rule with regard to attorneys or agents."

4. A Sheriff receiving worthless currency and entering satisfaction, the same is void, and the plaintiff has his remedy to have the entry canceled.

April 13, 1878. The opinion of the Court was delivered by

McIVER, A. J. This was an action on a Sheriff's official bond. The breach assigned was that the Sheriff, on 17th of July, 1863, had collected thirty-one hundred and sixteen 31-100 dollars under an execution in favor of B. F. Cleveland *vs.* Samuel Flemming, which was lodged in his office on 13th November, 1861, and had refused to pay over the same. The facts were that the Sheriff did receive the amount stated, at the time stated, in Confederate treasury notes, in full satisfaction of the execution, and reported promptly the receipt of the Confederate currency to the plaintiff in the execution, who refused to receive the same in satisfaction of his judgment. There was no endorsement of any stay upon the execution, nor were there any instructions given to the Sheriff not to receive Confederate currency, nor did the Sheriff confer with the plaintiff or his attorneys as to the propriety of receiving such currency.

Upon this state of facts a motion for a nonsuit was made and granted upon the ground that "the receipt of the Confederate money by the Sheriff was a nullity and in no wise changed the relation of the plaintiff, Cleveland, and the defendant, Flemming, existing before the payment of Confederate money, nor diminished the liability of Flemming to Cleveland."

This motion is now made to set aside the judgment of nonsuit and for a new trial.

While it may be true that a creditor has a right to demand and coerce payment in gold or silver in those cases not affected by the Act of Congress prescribing what shall be legal tender, it is none the less true that a debtor may, in the absence of any objection, liquidate his debt by payment of that which, while it may not possess the legal attributes of money, is yet, by common consent, so regarded and treated in ordinary business affairs. Hence it has been held that where bank notes are the ordinary currency of the country, a sale by a Sheriff under execution, at which he refused to take bank notes and required specie, without giving notice in the advertisement of sale that specie would be required, whereby the property was sold for less than its real value, would be set aside.— *Farr* vs. *Sims,* Rich. Eq. Ca., 122.

In that case O'Neall, J., in delivering the opinion of the Court, uses this language: "The usual terms of Sheriff's sale are cash. The term cash has two meanings—one a payment in current bills, the other in specie. The first is the popular, the latter the legal meaning. The former has, in common parlance, entirely supplanted the latter." The reasoning in this case, as well as in that of *Rice* vs. *McClintock,* (Dud., 354,) well warrants the conclusion that, in the absence of specific directions to the contrary, a Sheriff would be authorized to receive in payment of an execution lodged with him for collection bank notes which constitute the currency of the country at the time and place they are so received. This seems to be the rule not only here but elsewhere.

In the *United States Bank* vs. *Bank of Georgia,* (10 Wheat., 333,) Story, J., says: "Bank notes constitute a part of the common currency of the country and ordinarily pass as money. When they are received as payment the receipt is always given for them as money. They are a good tender as money, unless especially objected to, and, as Lord Mansfield observed in *Miller* vs. *Race,* (1 Burr., 457,) they are not, like bills of exchange, considered as

mere securities or documents for debts." Nor do we think that this doctrine is to be qualified as contended for in the argument: that it is true only where such bank notes are redeemable in specie on presentation at the counter of the bank which issued them, because, besides the fact that the case of *Rice* vs. *McClintock* arose during the suspension of specie payments by the banks of this State, consequent upon the panic of 1837, in which no such qualification is even hinted at, such a qualification would so narrow the doctrine as to deprive it of all practical efficiency. For if it is only to be applied when bank notes and specie stand upon exactly the same footing, and the former is readily convertible into the latter, it is difficult to conceive of a case in which the doctrine would be of any practical use. The true foundation for the doctrine is the implied consent of the creditor. For when bank or other notes constitute the *only* currency, and is in universal use as such, while Courts will still recognize the constitutional right of the creditor, *when asserted at the proper time*, to demand payment of his debt in that which is established by law as a legal tender, they will, in the absence of any such assertion, conclude that he assented to or authorized payment to be made in that currency which every one regarded and used as money. Applying this doctrine to this case, there would seem to be no doubt but that the Sheriff, in the absence of instructions to the contrary, was justified in receiving in payment of the execution Confederate treasury notes, which then constituted the *only* currency in use, and was recognized not only by individuals but by the government in all of its departments as the only standard of values, and had in every practical aspect all the attributes of money, except where its use or employment as such was distinctly objected.

The principles established by this Court in the case of *Pickens* vs. *Dwight* (4 S. C., 360,) apply with great force to the case now in hand. In that case the effort was to hold defendant liable for receiving payment in Confederate currency of a bond which was in his hands as Master in Equity under the following circumstances: Dwight contracted for the purchase of a plantation, in 1858, for the sum of five thousand dollars; but it being necessary to apply to the Court of Equity for the purpose of procuring good titles, the transaction was not perfected until the 4th June, 1861, when Dwight executed his four bonds, secured by a mortgage of the premises, to the Master for three thousand dollars, the balance of the purchase money, he

having on that day, and previously, made payments amounting to two thousand dollars. On the 29th April, 1863, Dwight paid the bond remaining in the hands of the Master to that officer in Confederate currency, the other three bonds having been otherwise disposed of. The Court declined to hold the Master liable, and in their decision, after repudiating the idea that Tupper was a trustee, they use this language: "A Master in Equity, in regard to the bonds committed to his charge, is the ministerial officer of the Court, the custodian of the treasury, holding it under its supervision. * * He does not hold the money as a trust, in the technical sense of the word, but is the financial agent of the Court; and where he has received it on a sale, under proper authority, he stands in no different relation to it than a Sheriff or a Referee who has made it under proceedings in a Court of law. *     *     * The Master was the officer of a Court in a State which satisfied all its obligations and engagements with Confederate currency, and accepted it in payment of debts due to it, without question as to the time when they were contracted. *     *     * The notes accepted by Mr. Tupper, 'were used as money in nearly all the business transactions of many millions of people. They must be regarded, therefore, as a currency imposed upon the community by irresistible force by a government, obedience to whose authority in civil and local matters was not only a necessity but a duty. They were the only measures of value which the people had, and their use was a matter of almost absolute necessity.'—*Thorington* vs. *Smith*, 8 Wall., 11. Should the Master, the mere officer of the Court, be held liable for doing that which had the implied sanction of the Court in its own mode of dealing with such notes? Was not the recognition of the currency, by receiving it at par value, on the sale of even the estates of minors, a sanction for the act of the Master in the case before us? *   *   * The Court, of which he was the officer, had prescribed the course which, under the like circumstances, he should adopt, by commending it through its own example." All this applies with equal force to the conduct of the Sheriff in receiving Confederate currency in payment of this execution, in the absence of any instructions to the contrary from those who owned or controlled the execution.

As to the ground taken in the argument that the Sheriff was liable because he neglected to enforce the execution immediately after its lodgment, " when the bills and notes constituting the circulating medium of the country were current at their par value," it is suffi-

cient to say that no such breach of the bond is alleged, the only breach assigned being the collection of the money and the refusal to pay it over. If such breach had been alleged and the Sheriff thus notified that this was a ground of complaint against him, it may be, for aught that the Court can know, that he may have been able to show that such delay was authorized by the plaintiff or his attorneys or in some other way have successfully met the charge. We may add, however, that as the execution was not lodged until 13th of November, 1861, he had but barely one sale day, if indeed that, in which he could levy and sell before the passage of the Act commonly called the Stay Law; and though that Act, having been decided to be unconstitutional, null and void, cannot be regarded as ever having had any *legal* force or effect, yet, in questions involving good faith or laches, it may, perhaps, be worthy of consideration that such a law was not only spread upon the statute book but was universally acquiesced in and treated as of binding force until the question of its constitutionality was raised in 1866, in the case of the *State* vs. *Carew.*

The defendants may, however, still be liable for the value of the Confederate currency at the time it was received, but of that we are not now prepared to judge, as the facts are not all before us.

The judgment of the Circuit Court is, therefore, set aside and a new trial ordered.

Motion granted.

*Willard,* C. J., and *Haskell,* A. J., concurred.