## EFFINGER *v.* KENNEY, Trustee.

### IN ERROR TO THE SUPREME COURT OF APPEALS OF THE STATE, OF VIRGINIA.

Argued November 10, 11, 1885.—Decided December 7, 1885.

Contracts made in the insurgent States, during the late civil war, between residents of those States, with reference to Confederate notes as a standard of value, and not designed to aid the insurrectionary government, may be enforced in the National courts; and the value of the contracts is to be determined by the value of the Confederate notes in lawful money of th United States at the time when and place where such contracts were made.

A statute of Virginia, of February, 1867, after declaring that, in an action or suit or other proceeding for the enforcement of any contract, express or implied, made between the 1st day of January, 1862, and the 10th of April, 1865, it shall be lawful for either party to show, by parol or other relevant testimony, what was the understanding and agreement of the parties, either express or implied, in respect to the kind of currency in which the same was to be performed, or with reference to which, as a standard of value, it was made, provides "that when the cause of action grows out of a sale or renting or hiring of property, whether real or personal, if the court, or, when it is a jury case, the jury, think that, under all the circumstances, the fair value of the property sold, or the fair rent or hire of it would be the most just measure of recovery in the action, either of these principles may be adopted as the measure of the recovery instead of the express terms of the contract:" *Held,* That the statute in this provision sanctions the impairment of contracts, which is not, under the Federal Constitution, within the competency of the legislature of the State. Accordingly, in a suit to enforce a lien for unpaid purchase money of real estate sold during the war, for which a note was given payable in dollars, but shown to have been made with reference to Confederate notes, a decision that the plaintiff was entitled to recover the value of the land at the time of the sale, instead of the value of Confederate notes at that time, was erroneous.

This case came from the Supreme Court of Appeals of Virginia. It was brought in one of the Circuit Courts of that State to enforce a vendor's lien claimed by James Kenney, the plaintiff below, defendant in error here, as trustee of one Allen C. Bryan, for the unpaid portion of the purchase money of certain real estate sold to Jacob P. Effinger, the defendant below and plaintiff in error here. The material facts of the

case were these : On the 7th of January, 1861, Allen C. Bryan and wife conveyed all their estate, real and personal, to James Kenney, in trust for the benefit of the wife and creditors of Bryan. The real estate was situated in Rockingham County, Virginia, and a portion of it, consisting of about 100 acres, was known as the "Home Farm" of Bryan. On the 30th of March, 1863, Kenney, the trustee, sold this farm at public auction to the highest bidder, pursuant to the deed of trust; and at that sale Effinger became the purchaser, at $210 per acre, one-third to be paid in cash and the balance in one and two years from the date of sale, with the privilege of paying in cash the first of these deferred payments. Effinger made the cash payment and the first of the deferred payments, and executed to the trustee his promissory note, or bond, as it is termed in the record, for the second deferred payment, amounting to $7067.72, payable on the 30th of March, 1865, with interest from date, stating in the instrument that the amount was the deferred payment on the "Home Farm" of Bryan. The trustee and the purchaser were at the time residents and citizens of Virginia. The first and second payments were made in treasury notes of the Confederate States, but after the maturity of the bond the third payment in such notes was refused by the trustee, and no payment in any other currency being made the present suit was brought. The Circuit Court was of opinion that the sale was made with reference to notes of the Confederate States as a standard of value; that the fair value of the property on the day of sale "was the most just measure of recovery;" and that such value was $80 an acre in lawful currency of the United States. This conclusion as to value was drawn from the fact that the land was assessed for taxation at that sum before the civil war, and that during the continuance of the war its value had not materially depreciated, the court observing that, "whilst the war had a tendency to impair the value of all kinds of property, yet, as to lands, that tendency was counteracted by the fact that they were not liable to be destroyed, and, therefore, afforded a safer means of investment than any other kind of property." It accordingly awarded judgment for one-third the value of the

land at the time of sale, estimating it to have been then worth $80 an acre in lawful currency, with interest on the sum thus adjudged to be due, and decreed a sale of the property to pay the amount unless the same was paid within a time designated.

In adopting the rule stated to arrive at what it deemed the "most just measure of recovery," the court acted in conformity with a statute of Virginia, passed on the 28th of February, 1867, amending and re-enacting sections of an act of the previous year "providing for the adjustment of liabilities arising under contracts or wills made between the first day of January, 1862, and the tenth day of April, 1865." This act of 1867 provided:

" SEC. 1. That in any action or suit, or other proceedings for the enforcement of any contract, express or implied, made or entered into between the first day of January, eighteen hundred and sixty-two and the tenth day of April, eighteen hundred and sixty-five, it shall be lawful for either party to show, by parol or other relevant testimony, what was the true understanding and agreement of the parties thereto, either express or to be implied, in respect to the *kind of currency* in which the same was to be fulfilled or performed, or with reference to which as a standard of value it was made or entered into; and in any action at law or suit in equity it shall not be necessary to plead the agreement specially in order to admit such evidence: *Provided*, that when the cause of action grows out of a sale or renting or hiring of property, whether real or personal, if the court (or when it is a jury case, the jury) think that, under all the circumstances, the *fair value of the property sold, or the fair rent or hire of it, would be the most just measure of recovery* in the action, either of these principles may be adopted as the measure of the recovery instead of the express terms of the contract.

" SEC. 2. Whenever it shall appear that any such contract was, according to the true understanding and agreement of the parties, to be fulfilled or performed in Confederate States treasury notes, or was entered into with reference to such notes as a standard of value, the same *shall be liquidated* and settled by reducing the nominal amount due or payable under such contract in Confederate States treasury notes *to its true value* at

the time they were respectively made or entered into, or at such other time-as may to the court, or if it be a jury case, to the jury, seem right in the particular case. . . ." Session Laws of 1866–7, 694; Code of 1873, ch. 138, §§ 1, 2.

The judgment of the Circuit Court was affirmed by the Supreme Court of Appeals of the State, and to review the judgment of the latter court this writ of error was brought.

*Mr. Jacob P. Effinger* in person; *Mr. Assistant Attorney-General Maury* was with him.

*Mr. William B. Compton*, for defendant in error.

MR. JUSTICE FIELD delivered the opinion of the court. After stating the case in the language above reported, he continued:

The contract of sale, which is the subject of consideration in this case, was made in Virginia, between citizens of that State, pending the late civil war, and with reference to notes of the Confederate States as the standard of value. These notes had, at that time, almost entirely superseded the use of coin, and they constituted the principal currency within those States. Not only the ordinary purchases of the necessaries of life, but contracts of every description, which were to be performed there, were made with reference to them. Such contracts were not invalid between the parties because payable in those notes, when not made in aid of the insurrectionary government. It was so held by this court in *Thorington* v. *Smith*, 8 Wall. 1, where it was declared that they must be regarded as a currency imposed on the community by irresistible force; and that this currency must therefore be considered, in the courts of law, in the same light as if it had been issued by a foreign government temporarily occupying a part of the territory of the United States. "Contracts stipulating for payments in this currency," said Mr. Chief Justice Chase, speaking for the entire court, "cannot be regarded, for that reason only, as made in aid of the foreign invasion in the one case, or of the domestic insurrection in the other. They have no necessary relation to the hostile government, whether invading or

insurgent. They are transactions in the ordinary course of civil society, and, though they may indirectly and remotely promote the ends of the unlawful government, are without blame, except when proved to have been entered into with actual intent to further invasion or insurrection. We cannot doubt that such contracts should be enforced in the courts of the United States, after the restoration of peace, to the extent of their just obligation," pp. 11, 12. That case, like the present, was a suit to enforce a vendor's lien for the unpaid purchase money of real estate. The property was situated in Alabama, and was sold during the civil war for $45,000, of which sum all but $10,000 was on the execution of the deed paid in Confederate treasury notes. For the residue the promissory note of the purchaser was given. The parties were both residents and citizens of that State. The plaintiff sought to enforce the note for the full amount in lawful money of the United States. The defendant proved that, at the time of sale, treasury notes of the Confederate States constituted the only currency in ordinary use in Alabama, and that, with few exceptions, all business transactions were conducted in them; that the land was then worth only $3000, in lawful money, and that the contract price of $45,000 was, by agreement, to be paid in those notes. When the case came to this court the question was considered as to the admissibility of evidence to prove that the promise for the payment of dollars, without qualifying words, was in fact made for the payment of other than lawful dollars of the United States. The court held that the evidence was admissible, observing that, whilst it is clear that a contract to pay dollars, made between citizens of any State of the Union maintaining its constitutional relations with the National government, is a contract to pay lawful money of the United States, and could not be modified or explained by parol evidence, "it is equally clear, if in any other country coins or notes denominated dollars should be authorized of different value from the coins or notes which are current here under that name, that, in a suit upon a contract to pay dollars made in that country, evidence would be admitted to prove what kind of dollars were intended, and, if it should turn out that foreign dollars

were meant, to prove their equivalent value in lawful money of the United States," p. 12; that such evidence does not modify or alter the contract, but simply explains an ambiguity which, under the general rules of evidence, may be removed by parol evidence. And the court added, that the people in the insurgent States under the Confederate government were, in legal contemplation, substantially in the same situation as inhabitants of districts of a country occupied and controlled by an invading belligerent; that contracts among them must be interpreted and enforced with reference to the condition of things created by the acts of the ruling power; and that in their light, it was hardly less than absurd to say that the dollars used in the insurgent States should be considered identical in kind and value with the dollars constituting the money of the United States.

It being thus held that a contract made during the war, in one of the insurgent States, between parties residing therein, payable in Confederate notes, is not for that reason invalid, and that parol evidence is admissible to show that by " dollars," used without qualifying words in a contract of that character thus made, those notes were intended, it becomes important to ascertain and lay down some definite rule, if possible, to determine their value, when the enforcement of such a contract is sought in a Federal court, or damages are claimed for its breach.

In *Thorington* v. *Smith*, above cited, the court held that the plaintiff was entitled to recover the actual value of the Confederate notes at the time and place of contract in lawful money of the United States.

In *Wilmington & Weldon Railroad Co.* v. *King*, 91 U. S. 3, the contract made in North Carolina during the war was for wood, and by its terms the wood was to be paid for in Confederate notes. In an action upon the contract the court below refused to instruct the jury that the plaintiff was entitled to recover only the value of the currency stipulated for the wood sold, but stated that he was entitled to recover the value of the wood without reference to the value of that currency. This court held this to be nothing less than instructing the jury that

they could put a different value upon the property from that placed by the parties at the time of the purchase. In its opinion the court referred to contracts made during the war in the insurgent States between residents there, payable in Confederate notes, which of course became worthless at the close of the war, and said it was manifest that, if these contracts were to be enforced with anything like justice to the parties, evidence must be received as to the value of the notes at the time and in the locality where the contracts were made; and added, that "in no other mode could the contract as made by the parties be enforced. To have allowed any different rule in estimating the value of the contracts, and ascertaining damages for their breach, would have been to sanction a plain departure from the stipulations of the parties and to make for them new and different contracts." p. 4. In reference to the statute of North Carolina which allowed the jury to place their own judgment upon the value of the contract, and did not require them to take the value stipulated by the parties, the court said: "A provision of law of that character, by constituting the jury a revisory body over the indiscretions and bad judgments of contracting parties, might in many instances relieve them from hard bargains, though honestly made upon an erroneous estimate of the value of the articles purchased, but would create an insecurity in business transactions which would be intolerable. It is sufficient, however, to say that the Constitution of the United States interposes an impassable barrier to such new innovation in the administration of justice, and with its conservative energy still requires contracts, not illegal in their character, to be enforced as made by the parties, even against any State interference with their terms." p. 5. The judgment was accordingly reversed.

In *Stewart* v. *Salamon*, 94 U. S. 434, the court held that the amount in actual money represented by a promissory note, executed during the war in the insurgent States, payable in Confederate treasury notes, was to be determined by the value of those notes in coin or legal currency of the United States at the time when, and the place where the promissory note was made.

In *Cook* v. *Lillo*, 103 U. S. 792, the doctrines declared in the

decisions mentioned were referred to as settled, although *Thorington* v. *Smith* was alone cited for them. The Chief Justice, after observing that it had long been settled in this court, that transactions in Confederate money during the late civil war between the inhabitants of the Confederate States, within the Confederate lines, not intended to promote the ends of the Confederate government, could be enforced in the courts of the United States, after the restoration of peace, to the extent of their just obligation, said: "It is equally well settled that, if a contract entered into under such circumstances, payable in dollars, was, according to the understanding of the parties, to be paid in Confederate dollars, upon proof of that fact, the party entitled to the payment can only recover the value of Confederate dollars in the lawful money of the United States," pp. 792–793.

In *Rives* v. *Duke*, 105 U. S. 132, the same doctrines were stated and followed. Mr. Justice Gray, in delivering the opinion of the court, said: "It is settled by the decisions of this court that a contract, made within the so-called Confederate States during the war of the rebellion, to pay a certain sum in dollars, without specifying the kind of currency in which it was to be paid, may be shown, by the nature of the transaction and the attendant circumstances, as well as by the language of the contract itself, to have contemplated payment in Confederate currency; and, if that fact is shown, in an action upon the contract, no more can be recovered than the value of that currency in lawful money of the United States," p. 140, citing the cases of *Thorington* v. *Smith*, 8 Wall. 1; *The Confederate Note Case*, 19 Wall. 548, 559; and *Wilmington & Weldon Railroad Co.* v. *King*, 91 U. S. 3. In *The Confederate Note Case*, the doctrines of the previous decisions were also stated and approved, but the bonds there in suit were distinguished from obligations payable in Confederate notes.

The several decisions mentioned, with one exception, were rendered by the court with the concurrence of all its members. In the excepted case only one judge dissented. It would seem, therefore, to be no longer open to question, that where contracts were made in the insurgent States during the war be-

tween residents of those States, with reference to Confederate notes as a standard of value, and were not designed to aid the insurrectionary government, they may be enforced in our courts; and that the value of the contracts is to be determined by the value of the Confederate notes in lawful money of the United States.

The measure of valuation adopted by the court below was not in conformity with this rule. It allowed a recovery for the value of the land instead of treasury notes, which was nothing less than substituting for the contract of the parties a new and different one. The statute of the State which permitted this estimate, whenever the court might think that the fair value of the property would be "the most just measure of recovery," and pursuant to which the court acted, sanctions the impairment of contracts, which is not, under the Federal Constitution, within the competency of the State legislature. It follows that the judgment must be reversed and the case remanded for a new trial, in which the plaintiff will be permitted to recover the value of the Confederate notes in lawful money of the United States, and not the value of the land at the time of sale.

There is, however, a further question for consideration which is not free from difficulty. The bond of the defendant, dated March 30, 1863, is payable two years thereafter, that is, on the 30th of March, 1865. At these respective dates the value of the Confederate notes was materially different. At the date of the bond their purchasing power was in Virginia at least one-third less than that of lawful money of the United States of the same nominal amount. At the maturity of the bond it was greatly less, not more than one-twentieth of that of lawful money. The Confederacy was then in the throes of dissolution; a few days afterwards it ceased to be an organized power, and the notes lost all appreciable value. The condition upon which their payment was promised— "after the ratification of a treaty of peace between the Confederate States and the United States of America"—had become impossible. It is evident, therefore, that, if their value in lawful money is to be estimated at the maturity of the bond, a nominal sum, not more than one-twentieth of its amount in

Confederate currency, can be recovered. In the case of contracts maturing after the overthrow of the Confederacy, no value whatever can be given to that currency.

In some of the cases decided by this court, to which we have referred, it is said that the value of the Confederate notes was to be estimated at the date and in the locality of the contract. Such is the language used in *Thorington* v. *Smith*, *Wilmington & Weldon Railroad Co.* v. *King*, and *Stewart* v. *Salamon*. In the first case, the note was payable one day after date. In the second case, it does not appear that the time of payment was fixed. But in the third case, the note was payable one year after date, and the court is careful to state that the value of the Confederate currency was to be estimated in lawful money of the United States at the time when and the place where the note was made. And this rule was prescribed in estimating the value of the Confederate currency for the balance due on the note after its maturity.

Where a contract is for the delivery of specific articles, the rule undoubtedly is that the damages recoverable for its breach are to be determined by the value of the articles at the time and place of their delivery. Where a contract is payable in a specified currency, the rule is also clear that such currency is demandable and receivable at the maturity of the contract, whatever change in its value by increase or depreciation may have taken place in the mean time. The damages recoverable for a breach of the contract are to be measured by the value of the currency at its maturity. But in these rules it is assumed that the articles to be delivered are lawful property, and that the currency to be paid is a lawful currency, and that, therefore, in the creation and exchange of both no public duty is violated. The treasury notes of the Confederate States constituted, under the laws of the United States, neither lawful property nor lawful currency. They were the promises of an insurgent and revolutionary organization, payable only when its success should be established by a treaty of peace with the United States. Of the value of such promises the National courts will make no inquiry, except as they were receivable in contracts not designed to further the insurrection. They were

receivable in such contracts because imposed as a currency upon the community by irresistible force. Their intrinsic value was nothing, but their exchangeable value, by reason of their enforced circulation, was the estimate of them at the time in lawful money of the United States. The relation between them and coin and other lawful money was well known in the community, as it was only with coin or other lawful money as a standard of value that commerce was conducted between the insurgents and persons outside of the Confederacy. Persons then parting with lands and goods for Confederate notes, or for the promise of them, attached to them this exchangeable value, and expected to receive it then or afterwards. They did not intend to surrender, or suppose they were surrendering, their property without any consideration, if the Confederacy should fail, and its notes lose this exchangeable value. They expected an equivalent in any event. Therefore, as having the value thus given to them at the time and place of their receipt, or the promise of them, the National courts will treat them, but not as having a value at any other time or place. Any other rule would involve considerations of inextricable difficulty, and would be inconsistent with justice in determining the value of contracts thus payable, where they matured near the close or after the overthrow of the Confederacy.

It follows, therefore, that on the new trial the plaintiff will be allowed to recover for this exchangeable value of Confederate notes, in which the bond was payable, estimated at the time and place of its execution, in lawful money of the United States.

*Decree reversed and cause remanded for further proceedings.*