ABOITIZ & CO. v. PRICE.
Civ. 1650.

United States District Court
D. Utah, Central Division.
June 16, 1951.

Warwick C. Lamoreaux, and David K. Watkiss, Salt Lake City, Utah, for plaintiff.

Franklin Riter, Fred L. Finlinson, Salt Lake City, Utah, for defendant.

RITTER, District Judge.

At the time of the Japanese sneak attack at Pearl Harbor on December 7, 1941, the defendant, Albert E. Price, was a national bank examiner in the employ of the United States Treasury Department, Office of the Comptroller of the Currency. He was attached to the staff of the Philippine High Commissioner, in Manila.

Captured when the Imperial Japanese invasion armies overran the Philippines, defendant was interned about January 2, 1942 with other American, British, Australian, and Dutch civilian nationals. And he was not liberated until February, 1945. American armed forces took Manila on February 3, 1945. Troopers of the motorized First Cavalry entered the Santo Tomas prison gate Saturday night, February 3, behind a tank that knocked down the barrier.[1] Defendant, together with some 3700 others, were rescued when the tank with its white star marking and 75-mm. gun crashed into the enclosure. All of the prisoners, including women and children, and the Dominican faculty of Santo Tomas University, were in a shocking state of emaciation after three years of Japanese captivity. The prisoners had lived almost entirely on rice, camotew (resembling sweet potato root), and garbage can salvage.

The defendant was held captive at two places during the three years of his imprisonment. At first, he, together with others on the High Commissioner's staff, and members of the diplomatic corps, were confined in a walled enclosure at Baldwin House in the suburbs of Manila. This

1. Salt Lake Tribune, February 6, 1945.

house had been seized by the Japanese for use as a prison. Later he was transferred to the former Santo Tomas University, one of the most infamous of the Japanese war internment camps.

At the Baldwin House, the Japanese had made such meagre provision to feed them, the prisoners early found other means by which to avert starvation. Food was smuggled in by friends. Guards relented when bribed. And, prisoners who had the money were able to buy food, as well as other privileges.

The consular group was repatriated some time in the latter part of 1943. Then defendant realized Baldwin House would not be maintained much longer for the small group remaining, and that his transfer to Santo Tomas was imminent.

Reports had reached the prisoners that conditions at Santo Tomas were much worse than at Baldwin House. Defendant knew that he would need money desperately, with which to bribe Japanese guards, and with which to buy himself food. Defendant had exhausted the funds he had on his person. He cast about for some method by which to obtain the money to take to Santo Tomas.

Interned with Price was a woman. She and Price had been employees in the High Commissioner's office. She had resided in the Philippine Islands for some time and Price had been there for only a short while. Price asked her if it was possible for her, by way of the underground, to arrange for him to borrow the money. She was able, through her acquaintance, and the knowledge of her people in the town, to make the contact for Price. She arranged (it is not clear how) that if Price on a certain day were able to get out of the Baldwin House and to go to the Philippine General Hospital in Manila he would meet a Mr. Brady in the corridor of the hospital, near the dental office. Prisoners were permitted to go outside the walls of the prison camp only for medical and dental care.

On the appointed day Price and three or four others left Baldwin House wearing red arm bands, under a close guard, and were taken to the Philippine General Hospital. He made his contact with Brady. Defendant arranged with Brady for the loan of the money. Defendant's friend in the prison camp had done her work well.

At this time Brady (who was presumably the agent of the plaintiff bank) asked about Price's financial standing and was told that Price had no estate and was dependent solely upon his salary as bank examiner, which was $8500 a year.

It was agreed Brady would provide the money and that one Tom Fu, an old chinaman employed at the Baldwin House, would bring in the notes for Price's signature. When the notes were returned to Brady he would send the money by Tom Fu to defendant. That, subsequently, was done. "Fu was able to get the money in, for which I naturally paid him quite well," Price testified.

Tom Fu, apparently, was trusted by both the Japanese and Americans, for he was allowed freely to go through the guards.

Later on Price arranged through Tom Fu for additional loans from Brady, and notes were exchanged for money brought in by the chinaman.

The notes in question were brought in to defendant by Tom Fu undated and without the name of the payee (undoubtedly to reduce the risk of Japanese reprisal.)

The money was military pass-money [2] issued by the Imperial Japanese Government. It was used by defendant at Santo Tomas to obtain food, other necessities and privileges through bribery of Japanese army guards. The cost of this traffic and the excessiveness of the bribes increased as the war went on.

During the last seven or eight months of defendant's internment, food was scarce and adequate amounts could not be obtained at any price. Japanese confiscation, inflation, and black markets aggravated the scarcities. The internees endured terrible suffering, and many died, including one R. B. North, also a national bank examiner, interned with defendant. North died at

---

2. Known in the Philippines as "Mickey Mouse" money. Christobal Rono v. Jose

L. Gomez, G. R. No. L–1927 (May 31, 1949)——Phil——.

Santo Tomas, in October, 1944. Price lost weight during his internment from 180 pounds to 95 pounds. North and defendant Price executed, jointly and severally, six of the nine notes here sued upon. Price alone signed the other three.

The parties hereto have stipulated as follows:

"1. That the defendant Price signed the three notes set forth and alleged in the Sixth, Seventh and Eighth Causes of Action of plaintiff's complaint and delivered the same to an agent of the plaintiff. That said notes were undated upon execution and delivery and did not contain the name of any payee.

"2. That the defendant Price and one R. B. North signed the notes set forth and alleged in the First, Second, Third, Fourth, Fifth and Ninth Causes of Action of plaintiff's complaint; that said Price and North caused the same to be delivered to an agent of the plaintiff; that neither of said notes were dated, nor did they contain the name of any payee upon delivery.

"3. That upon delivery of the promissory notes set forth and alleged in the Sixth, Seventh and Eighth Causes of Action of plaintiff's complaint by the defendant Price, he received in toto 10,000 pesos in war-notes (military pass-money) issued by the Imperial Japanese Government.

"4. That the said Price and North, upon signing and causing to be delivered the promissory notes set forth and alleged in the First, Second, Third, Fourth, Fifth and Ninth Causes of Action of plaintiff's complaint, received in toto 12,500 pesos in war-notes (military pass-money) issued by the Imperial Japanese Government, and defendant Price received one-half thereof and said North received the other half.

"5. That at all times mentioned in plaintiff's complaint the said war-notes (military pass-money) were printed and circulated by the Imperial Japanese Government and by order of the Commander in Chief of the Imperial Japanese Forces in the Philippine Islands were placed in general circulation in the occupied areas, of which Manila was one area, and during the same period of time anyone who attempted to interfere with the circulation of said war-notes (military pass-money), such as rejecting same for payment, forging the same or spreading untrue news concerning the same, his act was considered as hostile and was subject to severe punishment.

"6. That by proclamation the Commander in Chief of the Imperial Japanese Forces, on January 3, 1942, proclaimed the Military Administration of the Philippine Islands under martial law; that at the time and times of the signing of said promissory notes and the delivery of the same, acts similar to those of the plaintiff and defendant in this case, in exchanging promissory notes for war-notes (military pass-money) were punished by the Japanese military authorities occupying the Philippine Islands, and that civilians not interned were executed for helping American internees of the status of the defendant hereinafter described in paragraph 7, with funds.

"7. That the defendant Price and the said R. B. North were, at the time of the occupation of the Philippine Islands by the Imperial Japanese Forces, and at the times of the signing and delivery of all of said promissory notes, nationals of the United States of America, and as such were interned in Baldwin House, Manila, by orders of the Commander in Chief of the Imperial Japanese Forces in the Philippine Islands, and that at the time of the signing and delivery of said notes and each of them, said defendant Price and said North were held as internees by said Imperial Japanese Forces under heavy military guard."

The notes signed by North and Price all were similar in form to the following:

"Manila, Philippines,
June 16, 1943.

"₱500.00

"For Value Received, we promise to pay, jointly and severally, upon demand to the order of Aboitiz & Company, Inc., the sum of Five Hundred Pesos, (₱500.00), Philippine currency, without interest; the rate of exchange to be One U. S. Dollar for Two Pesos (Philippine currency), at the option of the lender.

"/s/ Albert E. Price
/s/ R. B. North"

The notes signed by defendant Price alone all were similar in form to the following:

"Manila, Philippines,
August 28, 1943.

"₱2,500.00

"For Value Received, I promise to pay upon demand to the order of Aboitiz & Company, Inc., the sum of Two Thousand Five Hundred Pesos (₱2,500.00), Philippine currency, without interest; the rate of exchange to be One U. S. Dollar for Two Pesos (Philippine currency), at the option of the lender.

"/s/  A. E. Price"

The plaintiff, Aboitiz & Company, Inc., is a banking corporation in the Philippine Islands, and the defendant Price is a citizen of the United States, whose domicil of origin and whose residence is Salt Lake City, Utah.

I

Defendant contends the notes are void for illegality.

First, defendant claims that the government of the Philippine Islands, under martial law, by the Japanese army of occupation, was a *de facto* government. And, he says there is an established principle of international law supporting the validity of the acts of a *de facto* government set up by a military conqueror. He urges that the sort of traffic in money between civilians outside and internees inside Japanese war prison camps as gave rise to these notes was forbidden under penalty of death by the *de facto* government. He contends that this proscription was valid, that it applies to these notes and renders them illegal where made, and he refers us to the principle of Conflict of Laws, that if a contract is illegal where made, it is usually invalid everywhere, and if valid where made, it is generally enforceable everywhere. .

Second, defendant claims that international and military tribunals sitting at the war crimes trials at Nurnberg and Tokyo

held that acts of aggressive warfare in World War II were criminal and in violation of at least nine different treaties. Those tribunals hanged some men, and condemned others to prison who participated in those acts. Defendant argues that if the whole Japanese enterprise was as criminal as the tribunals at Nurnberg and Tokyo say it was, then the Japanese war money received by Price was an illegal consideration for the notes.

Thus, it will be seen that defendant's contentions propose a dilemma to plaintiff. He claims the acts of the Japanese army of invasion and occupation either were legal or they were not. Either way, he says, defendant is entitled to win.

The propositions of defendant's argument, however, do not exhaust the situation. Moreover, neither proposition is valid.

This court concludes that the Japanese war notes were a legal medium of exchange. The Supreme Court of the Republic of the Philippines has so held.[3] To apply the general doctrine of the turpitude of consideration, as it affects the validity of contracts, to this currency would work the grossest injustice to millions of people in the Philippines, as the Supreme Court of the United States pointed out in the American Civil War cases. This currency, presumably, was used in the commonest transactions in the daily lives of the people for a period of over three years. It was used to make the simplest purchase in the market of daily food. It would be a cruel and oppressive judgment, attended by the greatest inconveniences imaginable, if all the transactions of the inhabitants of the Philippines, during the years of the Japanese occupation, were held tainted with illegality, because of the use of this currency.[4] Great inconvenience and disruption of most of the ordinary pursuits and business of society would have followed a failure to provide some

3. Haw Pia v. China Banking Corporation, G. R. No. L-554——Phil——, April 9, 1948.

4. See, in Note 80, infra, Pillet, Les lois actuelles de la guerre, and Spaight, War Rights on Land, summarized by Feilchenfeld, And, see, Thorington v. Smith, 1868, 8 Wall 1, 19 L.Ed. 361, which held valid the currency issued by the Confederate States and used during the Civil War.

medium of exchange. Moreover, in no sense could the use of the Japanese fiat currency in the transaction in question here be said to have been in aid of the invasion or occupation of the Philippines by the enemy Japanese. The issuance and use of this currency did not offend *ordre public*.

And, this court concludes that no valid legal consequence can attach in this court to an enemy edict or regulation forbidding friends, under penalty of death to help a citizen of the United States survive cruel and barbarous imprisonment.[5] Any other view would discourage such assistance at a time when most desperately needed. It penalizes loyal and brave friends. It puts a premium upon enemy aggression, brutality, and barbarity. To hold valid the Japanese army regulation against this traffic in money and the death penalty imposed upon our people for its violation, is not only contrary to the public policy of this land, but is repugnant to our deepest convictions.

To paraphrase the language of Cardozo, J.,[6] it would violate a fundamental principle of justice, a prevalent conception of good morals, a deep-rooted tradition of the commonwealth.

Defendant Price got the money he bargained for. The woman internee who befriended him, her relatives and friends in the city who assisted, the representatives of the bank, and the old chinaman, Tom Fu, all risked their lives to help Price. The loan was made without security and under the circumstances there must have been small hope of payment. The notes bore no interest. The conclusion is inescapable that Price was the beneficiary of most courageous, generous and unselfish assistance. It would not be honest to let him keep the money. One's mind rebels against such unjust enrichment. Happily, no authority has been referred to which requires that result.

Paragraphs 5 and 6 of the stipulation set out above are the only evidence in the record of a Japanese Army edict forbidding such traffic in money. Defendant, however, contends that the death penalty imposed by the Japanese for helping American internees, gives rise to an implication that a prohibitory edict existed.[7] It may well be doubted whether the principle of his authorities applies to the instant case. But, even if it does, it avails defendant nothing, and for the purposes of this opinion we will assume that his position on this matter is correct, and that there was such an edict.

Before discussing the applicable law, we must find what relationship the Japanese military authorities bore to Manila and surrounding territory. Was Japan a mere invader? Or, on the other extreme, had she acquired sovereignty over the Island of Luzon? It is submitted that neither is true. The relation was something more than invasion,[8] and much less than sovereignty.[9] The Japanese Imperial

---

5. A contemporary account of the hideous imprisonment, starvation, overwork, torture and beating of herself, husband and baby son in a Japanese war prison camp is told by Agnes Newton Keith, "Three Came Home", (1950), Atlantic Monthly and Little, Brown & Company.

6. Loucks v. Standard Oil Co., 224 N.Y. 99, 111, 120 N.E. 198, 202.

7. Bartlett v. Venor, Carth. 251; Levinson v. Boas, 150 Cal. 185, 88 P. 825, 12 L.R.A.,N.S., 575; McManus v. Fulton, 85 Mont. 170, 278 P. 126, 67 A.L.R. 690; Goldsmith v. Manufacturers Liability Insurance Co., 132 Md. 283, 103 A. 627.

8. Oppenheim, International Law, Vol. II, sec. 167, defined belligerent occupation as, "invasion *plus* taking possession of ene-my country for the purpose of holding it, at any rate temporarily. The difference between mere invasion and occupation becomes apparent by the fact that an occupant sets up some kind of administration, whereas the mere invader does not."

9. Since the close of the 19th Century, occupation alone does not transfer sovereignty. To do so requires cession by treaty of peace, abandonment in favor of the occupant, or extermination of the local sovereign and annexation of his realm. McNair, Legal Effects of War, 2d ed. pp. 319–320. Oppenheim, International Law, 6th Ed. Vol. II, pp. 337–338.

Present day International Law recognizes three stages in the process of conquest: (a) invasion; (b) occupation; and (c) transfer of sovereignty. McNair, pp. 310–320.

Army took possesion and set up an administration of the territory. It appears as a fact from the evidence before me and from the history of which I may take judicial knowledge, that the Japanese Government, through its officers, exercised effective governmental control over Manila and neighboring territory, from early in January 1942 until early in February 1945. But, the war was not over, and the United States government had not recognized that government. I conclude, therefore, that the Japanese Imperial government was provisionally in effective control, exercising administration over, and therefore, in the international law sense, in belligerent military occupation of Manila and surrounding territory at the times important here.[10]

■ Although it is correct to say that international law governs only the relations between States, and that it has nothing to do directly with disputes between private individuals, the principle has been clearly adopted in the United States that it is part of the law of the land, because either we have signed international agreements, or have otherwise written it into our municipal law. Oppenheim says:[11] "Such customary International Law as is universally recognized or has at any rate received the assent of the United States, and further all international conventions ratified by the United States, are binding upon American courts, even if in conflict with previous American statutory law; for according to the practice of the United States customary as well as conventional International Law overrule previous Municipal Law, provided, apparently, that they do not conflict with the Constitution of the United States."

In this opinion, it is necessary to consider portions of the Law of Nations in their municipal aspects. In passing it may not be out of the way to observe that recognition in the municipal law of international law principles is desirable, for it may hasten the day when trial by battle between nations will be just as obsolete as it has become in the English Common Law.

Counsel for defendant refers to the Japanese military government of the Philippines as a *"de facto"* government. This is an ambiguous term.[12] The situations in reference to which it has been used run the whole gamut from a government virtually the sovereign, although not yet *de jure,* down to belligerent invasion. Sometimes the term refers to recognition *de facto* and not *de jure* by the political departments of the recognizing power, e. g. the British Foreign Office, or our own State Department. McNair[13] and Oppenheim[14] say it is difficult to find any distinction between recognition *de facto* and *de jure* so far as the legal effects applied by courts are concerned.

Hence, in this opinion we use the term "belligerent occupation" which is clearer and more accurate.

McNair[15] says this distinction between *de facto* and *de jure* "should not be allowed to obscure the stage of belligerent occupation and to attach to that status the rights and duties appertaining to conquest recognized as a *de facto* situation. Belligerent occupation creates a well established status which has been equipped by International Law with rights and duties in the interests of order and the welfare of the inhabitants of the occupied territory."[16]

10. Art. 42, Hague Regulations, 36 Stats., part 2, p. 2306.

11. International Law, 6th Ed., Vol. II, sec. 101; ibid., 7th Ed. (1948) Vol. I, secs. 20, 21a (2), note 3, where United States Supreme Court cases are cited. Also, see Stone, Law and Its Administration, (1915), pp. 84–85.

12. Thorington v. Smith, 1868, 8 Wall. 1, 19 L.Ed. 361.

13. McNair, Legal Effects of War, pp. 353–354.

14. Oppenheim, 7th ed., Vol. I, p. 131.

15. McNair, Legal Effects of War, p. 354.

16. See also McNair, Legal Effects of War, pp. 340–343, and p. 320. Also, Oppenheim, International Law, 7th Ed., Vol. I, secs. 74 to 75g inclusive.

The relation of belligerent occupation is fully recognized by international law, and by a body of municipal law which has evolved through judicial decision in many countries, including our own.[17]

■ An enemy conqueror is not a very likely person in whom to repose the trust of administering the occupied territory. He is on the ground, however, and has the power to enforce his commands. And dangerous as it may be to recognize any authority in him, it is better to encourage some proper government than none at all. Without some kind of order, the whole social and economic life of the community would be paralyzed. So, international law has recognized the right of the occupant to make regulations for the protection of his military interests and the exercise of police powers. However, such law also imposes upon the occupant the duty to maintain public order and to provide for the preservation of the rights of the inhabitants.

The emphasis is upon public order and safety, and the welfare of the inhabitants.

This is recognized by Article 43 of the "Hague Regulations". These are the Annex to the 1907 Hague Convention IV, respecting the Laws and Customs of War on Land, Articles 42–56, entitled "Military Authority over the Territory of the Hostile State".[18] Both the United States and Japan signed and ratified this international agreement, which declares the governing international law principle: that the commander of a force occupying enemy territory "shall take all steps in his power to re-establish and ensure, as far as possible, public order and safety, while respecting, unless absolutely prevented, the laws in force in the country."

"Between 1918 and 1935, the validity and applicability of Articles 42–56 (of the Hague Regulations) were confirmed in a great number of decisions of international and domestic tribunals; they were never contested by any party to any dispute nor were they questioned by any government."[19]

And, our recognition of our own responsibilities is found in the United States Army Basic Field Manual, Rules of Land Warfare, and Basic Field Manual Military Government, prepared under the direction of the Judge Advocate General,[20] which instructs our occupation forces: "Military government should be just, humane, and as mild as practicable, and the welfare of the people governed should always be the aim of every person engaged therein. As military government is executed by force, it is incumbent upon those who administer it to be strictly guided by the principles of justice, honor and humanity—virtues adorning a soldier even more than other men for the very reason that he possesses the power of his arms against the unarmed. Not only religion and the honor of the Army of the United States require this course, but also policy."

Hyde [21] says, "The occupant enjoys the right and is burdened with the duty to take all the measures within his power to restore and insure public order and safety."

The leading writers all agree. Sir Arnold Duncan McNair, in his extremely helpful book,[22] says, "the principle is that the occupant being under a duty to maintain order and to provide for the preservation of the rights of the inhabitants and having a right recognized by international law to impose such regulations and make such changes as may be necessary to secure the safety of his forces and the realization of the legitimate purpose of his occupation, his acts, whether legislative, executive, or

17. For monographs and articles, as well as the leading textbooks, see Ernst H. Feilchenfeld, The International Economic Law of Belligerent Occupation, (1942), Monograph No. 6, Carnegie Endowment for International Peace, Division of International Law, pars. 5, 40, 245–247, and page 155.

18. 36 Stats., part 2, p. 2295, 2306. Note that the Regulations speak of "authority", not of sovereignty.

19. Feilchenfeld, supra, sec. 13, p. 5.

20. FM 27–10, Ch. 10, and FM 27–5, Government Printing Office, Washington, D. C., 1940.

21. Hyde, International Law, (ed rev. ed., 1945) Vol. III, p. 1882, sec. 690.

22. Legal Effects of War, 2d ed., (1944), p. 337. See McNair also, Note (16) above.

judicial, so long as he does not overstep these limits will be recognized by the British Government and by British Courts of law—during and after the war if Great Britain is neutral, after it if Great Britain is belligerent."

The British author, W. E. Hall, says [23] of postliminium, "Thus judicial acts done under (the control of the occupant), when they are not of a political complexion, administrative acts so done, to the extent that they take effect during the continuance of his control, and the various acts done during the same time by private persons under the sanction of municipal law, remain good. Were it otherwise, the whole social life of a community would be paralysed by an invasion (that is, occupation); and as between the state and individuals the evil would be scarcely less, * * * it would be hard for example that payment of taxes made under duress should be ignored, and it would be contrary to the general interest that sentences passed upon criminals should be annulled by the disappearance of the intrusive government."

Oppenheim in his chapter on postliminium, says [24] "if the occupant has collected the ordinary taxes, has sold the ordinary fruits of immoveable property, has disposed of such moveable State property as he was competent to appropriate, or has performed other acts in conformity with the laws of war, this may not be ignored by the legitimate sovereign after he has again taken possession of the territory. However, this only extends to acts done by or under the authority of the occupant during the occupation."

And, McNair [25] sums up: "Thus we apprehend that if the enemy were to occupy the Scilly Isles (English territory) * * * all the ordinary transactions of private law taking place in accordance with existing English law during the enemy administration, such as contracts, dispositions of moveables and immoveables, devolution of property by will or upon intestacy, and all normal official transactions such as the collection of ordinary taxes, would, at the end of the occupation, be treated as valid, and all judgments, civil and criminal, given in accordance with English law or with such regulations as the enemy was lawfully entitled to prescribe, would be respected. But if the enemy were to introduce a new system of landholding, for instance, to divide up an estate amongst the tenants and purport to make them freeholders, or a new system of local government, or a new marriage law, or were to disestablish and disendow the Church of England, such measures would not be respected."

In the footnote to this passage, the author says: "In regard to convictions for offenses, it seems necessary to exclude from this statement any unexpired result of convictions for offenses against the security of the occupant and his troops and any political offenses directed against him. But I can see no reason why a conviction for an offense against a rationing system or against a prohibition of profiteering imposed by the occupant in the interest of the community as a whole should not in principle continue to have effect after the end of the occupation. The Peace Treaty may, of course, expressly deal with this matter."

We need not here determine the precise scope of the authority permitted the occupant by international law. There are but two questions for determination:

First, shall a United States Court recognize as a valid medium of exchange the Japanese army pass-money received for the notes in question?

Second, shall a United States Court, long after the war is won, recognize as valid the Japanese army edict forbidding traffic, under penalty of death, in that money between internees and their friends outside the war prison camp?

The international law principle to be applied in the determination of these questions is simple: Were the Japanese decrees or regulations limited to the necessity of preserving the peace, order and good government of the Philippines?

23. International Law (8th ed.) p. 579, quoted pp. 337–338 of McNair.

24. International Law, Vol. II, sec. 282, quoted p. 338 of McNair.

25. Legal Effects of War, pp. 338–339.

Anything else was outside and beyond the authority conferred by international law.[26] And, I am not unmindful of the suggestion of writers upon international law that, in addition, the belligerent occupant has the right to make such regulations "as may be necessary to secure the safety of his forces and the realization of the legitimate purpose of his occupation".

The Japanese occupation was an act of unprovoked aggression. It was an international crime. It was outside and in violation of international law.

Japan and the United States agreed in the 1907 Hague Convention I for the Pacific Settlement of International Disputes: "* * * before an appeal to arms * * to have recourse, as far as circumstances allow, to the good offices or mediation of one or more friendly powers".[27]

And, Japan, as well as the United States, signed and ratified the 1907 Hague Convention III, relative to the opening of hostilities,[28] which contains the specific language: "The Contracting Powers recognize that hostilities between themselves must not commence without previous and explicit warning, in the form either of a reasoned declaration of war or of an ultimatum with conditional declaration of war."

We all remember the sneaking and deceitful tactics of Japan's diplomats, Kurusu and Nomura, on the eve of the surprise attack on Pearl Harbor, tactics which the record in the Nurnberg trials shows had Hitler's approval and commendation.[29] The occupation of the Philippines was in violation of at least these two provisions, and, from our point of view, that occupation could have no legitimate purposes which Japan was entitled to realize.[30]

The International Military Tribunal at Nurnberg says[31] in its judgment: "The charges in the Indictment that the defendants planned and waged aggressive wars are charges of the utmost gravity. War is essentially an evil thing. Its consequences are not confined to the belligerent states alone, but affect the whole world.

"To initiate a war of aggression, therefore, is not only an international crime; it is the supreme international crime differing only from other war crimes in that it contains within itself the accumulated evil of the whole."

Were it necessary (which it is not) in the present case to depart from established rules of international law, it would be legitimate to do so, for as Feilchenfeld says,[32] "The law of occupation shared and still shares with other parts of international law its most general and fatal weakness; there may be legitimate deviations from the rules if the other side violates international law. So long as there are no wartime tribunals of an international kind, it is in practice left to every state to decide whether it wants to assert that the other side has engaged in violations."

Tested by the principle that a belligerent occupant's decrees or regulations must be in the interest of the welfare of the inhabitants to be entitled to recognition by this court, the Japanese fiat currency was valid, but the prohibition of traffic between the internees and their friends was not.

Some recognized medium of exchange was necessary to keep the economic life of the community going. And, the power of a military government in occupied enemy ter-

26. Ochoa v. Hernandez y Morales, 230 U. S. 139, 33 S.Ct. 1033, 57 L.Ed. 1427 (where the Supreme Court held that a major-general of the U. S. Military forces, in occupation and control of Porto Rico as a colony of Spain, bound by the principles of international law to do whatever was necessary to secure public safety, social order, and the guaranties of private property, had overstepped those limits.)

27. Part II, Art. 2, 36 Stats. part 2, p. 2212.

28. Art. 1, 36 Stats. part 2, p. 2271.

29. 6 F.R.D. 105.

30. Although not strictly relevant, the cases of In re Yamashita, 1945, 327 U.S. 1, 66 S.Ct. 340, 90 L.Ed. 499, and Johnson v. Eisentrager, 1949, 339 U.S. 763, 70 S. Ct. 936, 94 L.Ed. 1255, are of interest.

31. 6 F.R.D. 73, 86.

32. The International Economic Law of Occupation, Monograph No. 6 of the Division of International Law, Carnegie Endowment for International Peace, par. 271 (1942).

ritory to issue military currency cannot seriously be questioned.

Feilchenfeld, in his valuable study,[33] says that such power is based upon the occupant's general power to maintain law and order recognized in Article 43 of the Hague Regulations. According to Feilchenfeld[34] the occupant may exercise that power in at least one of three ways: (1) When the local currency is inadequate, as, for example in the Balkan countries during the war of 1914–1918, and, again, in Belgium when the Belgian government in 1914, removed the metal coverage of the national currency to London, and "the local currency continues to be used, an occupant may re-organize the national currency by appropriate methods, such as the creation of new types and supplies of coverage". (2) An occupant may use his own currency in the occupied region. (3) When the local currency is inadequate, and the occupant is afraid to expose his own currency to the additional strain, the occupant may create new types of money.

Of the latter the Supreme Court of the Republic of the Philippines says:[35] "This last method was the one adopted by Japan in this country, because the coverage of the Philippine Treasury Certificate of the territory occupied had become inadequate, for most if not all the said coverage have been taken to the United States and many millions of silver pesos were buried or thrown into the sea near Corregidor, and Japan did not want to use her national currency, and expose it to additional strains."

The United States Supreme Court recognized the principle of the validity of such currency in Thorington v. Smith.[36] A promissory note, for the balance of the purchase price of Alabama land, made in 1864 between residents of Alabama payable in Confederate money was held enforceable in the United States courts after the war. During the Civil War the Confederacy issued its own currency which was used both in the South and in those portions of the North occupied by the Confederate army from time to time. In respect to the Confederate notes the Supreme Court said: "While the war lasted, however, they had a certain contingent value, and were used as money in nearly all the business transactions of many millions of people. They must be regarded, therefore, as a currency, imposed on the community by irresistible force.

"It seems to follow as a necessary consequence from this actual supremacy of the insurgent government, as a belligerent, within the territory where it circulated, and from the necessity of civil obedience on the part of all who remained in it, that this currency must be considered in courts of law in the same light as if it had been issued by a foreign government, temporarily occupying a part of the territory of the United States. Contracts stipulating for payments in this currency, cannot be regarded for that reason only, as made in aid of the foreign invasion in the one case, or of the domestic insurrection in the other. They have no necessary relations to the hostile government, whether invading or insurgent. They are transactions in the ordinary course of civil society, and, though they may indirectly and remotely promote the ends of the unlawful government, are without blame, except when proved to have been entered into with actual intent to further invasion or insurrection. We cannot doubt that such contracts should be enforced in the courts of the United States, after the restoration of peace, to the extent of their just obligation."

In 1948 this very same Japanese military fiat currency was held a valid medium of exchange by the Supreme Court of the

---

33. Id. par. 272, 285, 296.

34. Supra, p. 21, note 3.

35. Haw Pia v. China Banking Corporation, G. R. No. L-554——Phil—— April 9, 1948.

36. 8 Wall. 11, 19 L.Ed. 361, distinguished in Hanauer v. Woodruff, 1872, 15 Wall.

439, 21 L.Ed. 224. Thorington v. Smith was approved in Delmas v. Merchants' Insurance Co., 14 Wall. 661, 665, 20 L. Ed. 757; Planter's Bank v. Union Bank, 16 Wall. 483, 499, 21 L.Ed. 473; Confederate Note Case, 19 Wall. 548, 555-557, 22 L.Ed. 196.

Republic of the Philippines in Haw Pia v. China Banking Corporation.[37] Before the Japanese invasion a man had borrowed money from the China Bank and mortgaged his land for security. After the invasion, the Japanese took over the China Bank and appointed the Bank of Taiwan, Ltd. as liquidator. During the Japanese occupation, the mortgagor paid his debt in Japanese military fiat currency to the Bank of Taiwan. After the Philippines were recaptured by the American forces the China Banking Corporation called upon the mortgagor for payment claiming (1) the Japanese fiat money was not a valid medium of exchange, and (2) the Bank of Taiwan, liquidator, was not a proper party to whom to make payment. Both contentions were rejected by the court, and the debt and mortgage were declared satisfied and discharged.

The decision in Haw Pia v. China Banking Corporation was followed by the Supreme Court of the Philippines in Hongkong and Shanghai Banking Corporation v. Luis Perez Samanillo, Inc., and Register of Deeds of Manila.[38] The Bank of Taiwan, Ltd., was appointed by the Japanese Army of occupation as liquidator of the Hongkong and Shanghai Banking Corporation. Before the invasion, the latter Bank had extended credit to the defendant Samanillo, Inc. secured by mortgage on lands. On the date of the Japanese invasion January 1, 1942, the amount owing was nearly one and one-half million pesos. During the occupation the debtor paid the amount of the debt in Japanese war notes to the Bank of Taiwan, Ltd., and received from the latter a cancellation and discharge of the mortgage. In an action to recover the debt and to annul the deed of cancellation of the mortgage, the court held the payment was valid and released the defendant from his obligation to the plaintiff Hongkong and Shanghai Bank.

The Hague Regulations respecting the laws and customs of war on land annexed to Hague Convention IV of 1907, signed and ratified by both Japan and the United States, were intended to serve as a general rule of conduct for the belligerents in their relations to the inhabitants. It was not found possible to cover specifically in the Regulations all the circumstances which might arise in practice. On the other hand, it was "clearly" not intended to leave the unforeseen cases to the arbitrary judgment of military commanders. Hence, the High Contracting parties agreed that:

"Until a more complete code of the laws of war has been issued, the High Contracting Parties deem it expedient to declare that, in cases not included in the Regulations adopted by them, the inhabitants and the belligerents remain under the protection and the rule of the principles of the law of nations, as they result from the usages established among civilized peoples, from the laws of humanity, and the dictates of the public conscience."[39]

This provision, and Article 43, which requires the occupant to "* * * take all the measures in his power to restore, and ensure, as far as possible, public order and safety * * *",[40] are ample recognition by this country of the power of the occupant to issue war currency. The validity of such war currency is not only supported by these principles of international law, to which our own country has given its assent, but, it is supported by the dictates of a sound public policy, and, there is back of it a long history of the use of war money by many nations.

During our own Revolutionary War, the Continental Congress issued currency for use in British territory occupied by the colonial troops before the Declaration of Independence.[41] The rebel government of the Confederate States issued a war currency which, as we have seen, was

37. Supra.

38. G. R. No. L-1345, —— Phil. —— Nov. 10, 1948. See also Philippine Trust Company v. Luis Ma. Araneta, et al., G. R. No. L-2734, —— Phil. ——, —— March 17, 1949; Christobal Rono v. Jose L. Gomez, G. R. No. L-1927, —— Phil. ——, May 31, 1949.

39. 36 Stats., Part 2, p. 2279-80.

40. 36 Stats., Part 2, p. 2306.

41. Dewey, Financial History of the United States, 37-38.

held valid by the Supreme Court of the United States.

Moreover, the United States and her allies in World War II issued occupation currency in Sicily, Germany, and Austria. The Combined Chief of Staffs of the Supreme Allied Commander issued a directive June 24, 1943, that the task forces use, besides regular United States coins, yellow seal dollars and besides regular British coins, British Military Authority (BMA) notes, to supplement lire currency.[42] The Combined Directive for Military Government in Germany, April 28, 1944, directed the Allied forces to use yellow seal dollars and British Military Authority notes (BMA), if the Reichs mark currency became inadequate.[43] The American Directive on Military Government of Austria, June 27, 1945, ordered our forces to use for military purposes only Allied Military Schillings.[44]

The United States Army and Navy Manual of Military Government and Civil Affairs,[45] instructs theatre commanders of United States forces as follows:

"Functions of Civil Affairs Officers.—In the occupation of such territories for a considerable period of time, the civil affairs officers will in most cases be concerned with the following and other activities:

1. Money and banking.—Closing, if necessary and guarding of banks, bank funds, safe deposit boxes, securities and records; providing interim banking and credit needs; liquidation; reorganization, and reopening of banks at appropriate times; regulation and supervision of credit cooperatives and other financial agencies and organizations; *execution of policies on currency fixed by higher authority, such as the designation of types of currency to be used and rates of exchange supervision of the issue and use of all types of money and credit;* declaration of debt moratoria; prevention of financial transactions with enemy occupied territory."

Germany used occupation currencies on a large scale in World War II, the most widely used being the Reichskroditkassa mark. The British issued currency during the occupation of Archangel in World War I.[46] And the British, during the Boer War, issued negotiable receipts for goods, similar to currency.[47]

During the Russo-Japanese War, Japan issued occupation currency in Korea and Manchuria.[48]

The French printed Reichsbank notes during the occupation of the Ruhr in 1923.[49]

In the majority opinion in Haw Pia v. China Banking Corporation, Justice Feria also points out the interesting fact that, at least as early as the year 1122, during the siege of Tyre Doge Micheli issued leather money which he promised to redeem upon his return to Venice.[50] And that Frederick II, at the siege of Milan, also used leather money.

It would seem to be clear that the power of a military occupant to issue a fiat currency for use in occupied territory is fully established and recognized by the United States, as well as in international law, and history, and practice.

Recognition of the relation of belligerent occupation does not rest alone upon international law. The municipal law of the United States, England and other countries give it full status and recognition.[51] As early as 1815, in our own country, Chief Justice Marshall correctly stated the common law as it is understood by American

42. Hajo Holborn, American Military Government, 1947, pp. 115, 116.

43. Id. p. 140.

44. Id. p. 192.

45. F.M. 2710 OPNAV 50–E–3, paragraph 12.

46. White, Currency of the Great War, 66; League of Nations, Currency After the War, 100.

47. Spaight, War Rights on Land, 396.

48. Takahasin, International Law in the Russo-Japanese War, (1908) 260–261; Ariga, La Guerre Russo-Japanese (1908), 450 et seq.

49. Nussbaum, Money in the Law, 158–159, Note 6.

50. Del Mar, Money and Civilization, 26 and 33.

51. McNair, Legal Effects of War, (1944), Chapter 17.

and English Courts.[52] During the War of 1812, Great Britain invaded and subdued the Danish Island of Santa Cruz. Bentzon, a Danish subject, owned land in Santa Cruz from which thirty hogsheads of sugar were shipped during the occupation. An American privateer captured the ship and brought it to Baltimore, where the sugar was libelled as enemy property. Chief Justice Marshall held there was no error in condemning the sugar as enemy property and said: "Some doubt has been suggested, whether Santa Cruz, while in the possession of Great Britain, could properly be considered as a British island. But for this doubt there can be no foundation. Although acquisitions made during war are not considered as permanent, until confirmed by treaty, yet, to every commercial and belligerent purpose, they are considered as a part of the domain of the conqueror, so long as he retains the possession and government of them. The island of Santa Cruz, after its capitulation, remained a British island, until it was restored to Denmark."

Santa Cruz, for purposes of American law, was enemy occupied territory, and the sugar crop from the Santa Cruz plantation was subject to condemnation in prize as enemy property.

For a while the English courts seem to have lost sight of this principle,[53] Marshall's opinion apparently being overlooked. In 1943, however, the House of Lords expressly adopted Marshall's view in Thirty Hogshead of Sugar, Bentzon v. Boyle, and rests its decision upon his authority.[54] A shipping company, incorporated and domiciled in Holland, was engaged in England in an arbitration. The other party to the arbitration refused to proceed upon the ground that the Dutch company had become an alien enemy by virtue of the German occupation of Holland in May, 1940. The question arose upon a summons by the Dutch company for the appointment of an umpire. The House of Lords held that the rule refusing *persona standi in judicio* was applicable to the Dutch company because it was a resident in enemy-occupied territory. In the speeches of Viscount Simon, Lord Chancellor and Lords Wright and Porter, there is agreement that what amounts to enemy occupation depends upon the nature of the occupation and the facts of each case.

"If as a result of the occupation the enemy is provisionally in effective control of an area at the material time, and is exercising some kind of government or administration over it, the area acquires 'enemy character'. Local residents cannot sue in our Courts and goods shipped from such an area have enemy origin—see Marshall, C. J. in the Thirty Hogshead of Sugar, Bentzon v. Boyle, 1815, 9 Cranch 191, 195, 3 L.Ed. 701. If, on the other hand, the occupation is of a slighter character, for instance, if it is incidental to military operations and does not result in effective control—the case is different as in Cremidi v. Powell, The Gerasimo (1857) 11 Moore P.C. 88. * * * In the present case, the occupation of Holland by Germany is plainly, as things stand, of the more absolute kind." (Lord Chancellor Simon)

Lord Wright said, "This enemy character depends on objective facts, not on feeling or sentiment, or birth, or nationality. They (the inhabitants of enemy-occupied countries) have been described as territorial or technical enemies. Their status is based on residence, or, if they are traders, on what has been called commercial domicil, which has the peculiarity that it may be attached to a trader who is not personally present in the occupied territory, but resides, for example, in a neutral country. He is an enemy *vis-a-vis* the other belligerent in respect of the particular affairs of trade in the occupied or conquered territory which gave him a commercial domicil there. The occupied ter-

52. Thirty Hogsheads of Sugar, Bentzon, claimant, v. Boyle, 1815, 9 Cranch 191, 3 L.Ed. 701.

53. The Gerasimo, (Privy Council, 1857), 11 Moore P.C. 88.

54. V/O Sovfracht v. N. V. Gebr. Van Udens Scheepvaart en Agentuur Maatschappij, (1943) A.C. 243.

ritory may merely be part of a larger territory which, so far as unoccupied, retains its national character."

Lord Porter said, "The solution, in my view, depends upon the quality of the occupation, to be judged by the time it endures, the amount of control exercised, and the extent to which the former government is superseded."

Another American decision of great authority is that of United States v. Rice.[55] Daniel Webster cited authorities reported in the margin, but Mr. Justice Story said that Webster's position was "too clear to require any aid from authority". During the War of 1812, British Naval and Military forces captured and took possession of the town and harbor of Castine, Maine. They exercised exclusive civil and military authority, opened a custom house and appointed a collector. Duties on imports were paid to the military collector by United States citizens who continued to reside in Castine under the British occupation. Upon the re-establishment of the American government, it claimed the right to collect duties on the same goods. Story held that American duties could not be collected,[56] and said: "By the conquest and military occupation of Castine, the enemy acquired that firm possession which enabled him to exercise the fullest rights of sovereignty [57] over that place. The sovereignty of the United States over the territory was, of course, suspended, and the laws of the United States could no longer be rightfully enforced there, or be obligatory upon the inhabitants who remained and submitted to the conquerors. By the surrender, the inhabitants passed under a temporary allegiance to the British government, and were bound by such laws, and such only, as it chose to recognize and impose. From the nature of the case, no other laws could be obligatory upon them, for where there is no protection or allegiance or sovereignty, there can be no claim to obedience. Castine was, therefore, during this period, so far as respected our revenue laws, to be deemed a foreign port; and goods imported into it by the inhabitants were subject to such duties only as the British government chose to require. Such goods were in no correct sense imported into the United States."

A decision of the Supreme Court of the United States arising out of the Spanish possession of Louisiana after cession to the United States furnishes at least an analogy. After the cession of Louisiana, but before the United States actually took possession, a Spanish tribunal there made an adjudication involving lands. In Keene v. McDonough,[58] the Supreme Court of the United States upheld a title based thereon and said: "The adjudication having been made by a Spanish tribunal, after the cession of the country to the United States, does not make it void; for we know, historically, that the actual possession of the territory was not surrendered, until some time after these proceedings took place. It was the judgment, therefore, of a competent Spanish tribunal, having jurisdiction of the case, and rendered whilst the country, although ceded, was, *de facto,* in the possession of Spain, and subject to Spanish laws. Such judgments, so far as they affect the private rights of the parties thereto, must be deemed valid."

Belligerent military occupation governments are familiar to our courts. British forces occupied Santa Cruz and Castine, Maine during the War of 1812. United States forces occupied parts of Mexico during the Mexican War of 1846. Union forces in our Civil War established suc-

---

55. 1819, 4 Wheat. 246, 4 L.Ed. 562.

56. If inhabitants are compelled to pay taxes to occupant, they are acquitted of obligation to pay their regular government. Fouchille, Traite de droit international public, (1921), p. 264, following the Declaration of Brussels of 1874. Feilchenfeld, justifies occupant's power to impose new taxes and customs duties under his power to restore and ensure public order, p. 49, sec. 202, The International Economic Law of Belligerent Occupation, (1942).

57. The "conquest" did not transfer sovereignty. See, supra, Note 9. I venture the thought that Story, pretty clearly, did not intend to use the word "sovereignty" in its narrow sense.

58. 8 Pet. 308, 310, 8 L.Ed. 955.

cessive military governments as the Confederacy gave ground. The Confederates established a military government in ·Arizona[59]. American forces occupied ·Cuba, Porto Rico, and the Philippines during the war with Spain in 1898. American forces and their allies occupied the Rhineland in World War I, and Sicily, Austria, Germany and Japan, to mention only a few in World War II.

Decisions of the Supreme ·Court of the United States arising out of these occupations have produced a considerable body of law.

Tampico, Mexico, and the whole state of Tamaulipas, were occupied in 1846 and during the Mexican War by the troops of the United States. Of this occupation, Chief Justice Taney said, in Fleming v. Page,[60] "It is true, that, when Tampico had been captured, and the state of Tamaulipas subjugated, other nations were bound to regard the country, while our possession continued, as the territory of the United States, and to respect it as such. For, by the laws and usages of nations, conquest is a valid title, while the victor maintains the exclusive possession of the conquered country. The citizens of no other nation, therefore, had a right to enter it without the permission of the American authorities, nor to hold intercourse with its inhabitants, nor to trade with them. As regarded all other nations, it was a part of the United States, and belonged to them as exclusively as the territory included in our established boundaries."

California, or at least, the port of San Francisco, had been conquered by the arms of the United States in 1846. Shortly afterward the United States had military possession of all of Upper California. Early in 1847 the President, as constitutional commander-in-chief of the army and navy, authorized the military and naval commander of our forces in California to exercise the belligerent rights of a conqueror, and to form a civil government for the conquered country, and to impose duties on imports and tonnage as military contributions for the support of the government, and of the army which had the conquest in possession.

The court held in ·Cross v. Harrison,[61] that the government of California set up by right of belligerent occupation continued until Congress otherwise terminated it, and that duties collected by it could not be recovered.

On the 1st of May, 1862, the army of the United States captured the City of New Orleans. It was held by military occupation until the 18th of March, 1866, when its government was handed over to the proper city authorities. During the military occupation it was governed by officials appointed by the commanding general. Those officials leased water-front property to the steamship company for a term of ten years. The Supreme Court held the lease valid for its whole term, although within nine months after its execution the military government of the city ended.[62]

General Miles occupied San Juan, Porto Rico, during our war with Spain in 1898. He issued a proclamation directing the exaction of the former Spanish and Porto Rican duties. Goods were imported into

59. Birkhimer, Military Government and Martial Law, p. 93, also, pp. 53, 80 and 89. See also, Winthrop, Military Law, p. 800. Wigmore, Guide to American International Law, Part II (1942), sec. 80, and following.

60. 1850, 9 How. 603, 615, 13 L.Ed. 276.

61. 1853, 16 How. 164, 14 L.Ed. 889.

62. New Orleans v. Steamship Co., 1874, 20 Wall. 387, 22 L.Ed. 354. The decision may be placed on the narrower ·ground, that the city had adopted the lease before repudiation. See Mr. Justice Hunt's special concurring opinion. See also, Dow v. Johnson, 1879, 100 U.S. 158, 25 L.Ed. 632. A U. S. army commanding general ordered plaintiff's Louisiana plantation stripped to obtain supplies for the use of his forces. Plaintiff got default judgment in New Orleans court during war on which he sued in federal court of Maine after war. Held: plea of *nul tiel record* good, for New Orleans court had no jurisdiction. Our army of occupation was not subject to Confederate laws, but only to our own.

the port of San Juan from New York upon which duties were imposed.

Even though the goods were imported from our own port of New York into Porto Rico, the duties were held to have been legally exacted in Dooley v. United States.[63] The Supreme Court said: "Upon the occupation of the country by the military forces of the United States the authority of the Spanish government was superseded, but the necessity for a revenue did not cease. The government must be carried on, and there was no one left to administer its functions but the military forces of the United States. Money is requisite for that purpose, and money could only be raised by order of the * * * continuation of existing duties. In adopting this method, General Miles was fully justified by the laws of war. The doctrine upon this subject is thus summed up by Halleck in his work on International Law (vol. 2, page 444): 'The right of one belligerent to occupy and govern the territory of the enemy while in its military possession is one of the incidents of war, and flows directly from the right to conquer. * * * Such authority and such rules are derived directly from the laws of war, as established by the usage of the world, * * *.' "

When the Spanish fleet was destroyed at Manila, May 1, 1898, the government of the United States made provision for the government of such part of the Philippines as came under military occupation by the forces of the United States. In MacLeod v. United States[64] Mr. Justice Day said: "The right to thus occupy an enemy's country and temporarily provide for its government has been recognized by previous action of the executive authority, and sanctioned by frequent decisions of this court. The local government being destroyed, the conqueror may set up its own authority, and make rules and regulations for the conduct of temporary government, and to that end may collect taxes and duties to support the military authority and carry on operations incident to the occupation. Such was the course of the government with respect to the territory acquired by conquest and afterwards ceded by the Mexican government to the United States."

McNair[65] reproduces a summary taken from two decisions of the Supreme Court of the United States,[66] and also reproduced in Moore, Digest of International Law, sec. 22, "which (he says) may be said to sum up the fruits of American judicial experience arising out of the American Civil War." They fully support the position we take here, and the distinction between the validity of Japanese war money, and the invalidity of the penal decree against the traffic out of which the notes arise.

And, Hervey,[67] says of the Civil War cases: The Supreme Court of the United States sustained numerous acts. " * * * It generally upheld all laws which were necessary to the peace and good order of the realm, * * * in each instance the acts, decrees or laws are recognized as valid by the Supreme Court unless public policy and justice required otherwise."

The Supreme Court says in Baldy v. Hunter, supra: "From these cases it may be deduced:

"That the transactions between persons actually residing within the territory dominated by the government of the Confederate States were not invalid for the reason only that they occurred under the sanction of the laws of that government, or of any local government recognizing its authority.

"That within such territory the preservation of order, the maintenance of police regulations, the prosecution of crimes, the protection of property, the enforcement of

63. 1900, 182 U.S. 222, 230, 21 S.Ct. 762, 765, 45 L.Ed. 1074.

64. 1912, 229 U.S. 416, 424, 33 S.Ct. 955, 957, 57 L.Ed. 1260. Also Santiago v. Nogueras, 1908, 214 U.S. 260, 29 S.Ct. 608, 53 L.Ed. 989; Lincoln v. United States, 1904, 197 U.S. 419, 25 S.Ct. 455, 49 L.Ed. 816 (Holmes).

65. Legal Effects of War, p. 350–352.

66. Ford v. Surget, 1878, 97 U.S. 594, 604, 24 L.Ed. 1018, and Baldy v. Hunter, 1898, 171 U.S. 388, 400, 18 S.Ct. 890, 43 L.Ed. 208.

67. Legal Effects of Recognition (1928) p. 145.

620

contracts, the celebration of marriages, the settlement of estates, the transfer and descent of property, and similar or kindred subjects, were, during the war, under the control of the local governments constituting the so-called Confederate States.

"That what occurred or was done in respect of such matters under the authority of the laws of these local *de facto* governments should not be disregarded or held [to be] invalid merely because those governments were organized in hostility to the Union established by the national constitution; this, because the existence of war between the United States and the Confederate States did not relieve those who were within the insurrectionary lines from the necessity of civil obedience, nor destroy the bonds of society, nor do away with civil government or the regular administration of the laws, and because transactions in the ordinary course of civil society as organized within the enemy's territory, although they may have indirectly or remotely promoted the ends of the *de facto* or unlawful government organized to effect a dissolution of the Union, were without blame 'except when proved to have been entered into with actual intent to further invasion or insurrection.' And

"That judicial and legislative acts in the respective states composing the so-called Confederate States should be respected by the courts if they were not 'Hostile in their purpose or mode of enforcement to the authority of the national government, and did not impair the rights of citizens under the constitution.' * * *" [171 U.S. 388, 18 S.Ct. 894.]

The Supreme Court in State of Texas v. White,[68] which also was a Civil War case, says:

"It is not necessary to attempt any exact definition, within which the acts of such a State Government must be treated as valid or invalid. It may be said, perhaps with sufficient accuracy, that acts necessary to peace and good order among citizens, * * * which would be valid if emanating from a lawful government, must be re-

garded in general as valid when proceeding from an actual, though unlawful, government; and that acts in furtherance or support of rebellion against the United States, or intended to defeat the just rights of citizens, and other acts of like nature, must, in general, be regarded as invalid and void."

State of Texas v. White is an illustration of an act of a belligerent which is in furtherance or support of war against the United States, and therefore void. To compensate the State of Texas for claims connected with the settlement of her boundary, the United States delivered to her $5,000,000 in five percent bonds. The Texas legislature required the governor's endorsement of them. After the outbreak of the Civil War, intending to aid the rebellion by facilitating the transfer of the bonds, the insurgent Texas legislature repealed the act requiring the governor's endorsement, and authorized a military board to use the bonds for the purpose of levying war against the United States. Under this authority, the board sold and delivered the bonds to the defendants, who agreed to ship into the South medicines and other goods needed there. After the War, Texas brought an original suit in the Supreme Court, claimed the bonds as her property, and asked an injunction to restrain defendants from collecting from the government, and the surrender of the bonds. In answer to the question whether or not the title of the State to the bonds was divested by the transfer of the military board, the court held invalid the act of the rebel Texas legislature repealing the restriction upon transfer. Consequently, title to the bonds had not passed out of the State.

Justice Miller very well expressed the distinction in Sprott v. United States,[69] which also well illustrates the principle applicable to the case at bar. A purchaser of cotton from the Confederate States, who knew that the money he paid for it went to sustain the rebellion, sued in the Court of Claims to recover the proceeds when it was captured and sold. The court held he could not recover, and said:

68. 1868, 7 Wall. 700, 733, 19 L.Ed. 227.

69. 1874, 20 Wall. 459, 460, 462, 22 L.Ed. 371.

"The claimant now asserts a right to this money on the ground that he was the owner of the cotton when it was so captured. This claim of right of ownership he must prove in the court of Claims. He attempts to do so by showing that he purchased it of the Confederate government and paid them for it in money. In doing this he gave aid and assistance to the rebellion in the most efficient manner he possibly could. He could not have aided that cause more acceptably if he had entered its service and become a blockade runner, or under the guise of a privateer had preyed upon the unoffending commerce of his country. It is asking too much of a court of law sitting under the authority of the Government then struggling for existence against a treason respectable only for the number and the force by which it was supported, to hold that one of its own citizens, owing and acknowledging to it allegiance, can by the proof of such a transaction establish a title to the property so obtained. The proposition that there is in many cases a public policy which forbids courts of justice to allow any validity to contracts because of their tendency to affect injuriously the highest public interests, and to undermine or destroy the safeguards of the social fabric, is too well settled to admit of dispute. That any person owing allegiance to an organized government, can make a contract by which, for the sake of gain, he contributes most substantially and knowingly to the vital necessities of a treasonable conspiracy against its existence, and then in a court of that Government base successfully his rights on such a transaction, is opposed to all that we have learned of the invalidity of immoral contracts. A clearer case of turpitude in the consideration of a contract can hardly be imagined unless treason be taken out of the catalogue of crimes."

The court further said: "The recognition of the existence and the validity of the acts of the so-called Confederate government, and that of the States which yielded a temporary support to that government, stand on very different grounds, and are governed by very different considerations. * * * These laws, necessary in their recognition and administration to the existence of organized society, were the same, with slight exceptions, whether the authorities of the State acknowledged allegiance to the true or the false Federal power. They were the fundamental principles for which civil society is organized into government in all countries, and must be respected in their administration under whatever temporary dominant authority they may be exercised. It is only when in the use of these powers substantial aid and comfort was given or intended to be given to the rebellion, when the functions necessarily reposed in the State for the maintenance of civil society were perverted into the manifest and intentional aid of treason against the Government of the Union, that their acts are void."

Another example of invalidity is found in Horn v. Lockhart.[70] An executor received Confederate money from the sale of property of the estate and invested it in bonds of the Confederate States. The receipt and investment of the money were in accordance with laws of the rebel legislature of Alabama. The court held the executor, after the Civil War, could not exonerate himself from liability to the legatees by paying them in the Confederate bonds. Justice Field again states the distinction we here make:

"It would seem that there could be but one answer to this question. The bonds of the Confederate States were issued for the avowed purpose of raising funds to prosecute the war then waged by them against the government of the United States. The investment was, therefore, a direct contribution to the resources of the Confederate government; it was an act giving aid and comfort to the enemies of the United States; and the invalidity of any transaction of that kind, from whatever source originating, ought not to be a debatable matter in the courts of the United States. No legislation of Alabama, no act of its convention, no judgment of its tribunals, and no decree of the Confed-

70. 1873, 17 Wall. 570, 21 L.Ed. 657.

erate government, could make such a transaction lawful.

"We admit that the acts of the several States in their individual capacities, and of their different departments of government, executive, judicial, and legislative, during the war, so far as they did not impair or tend to impair the supremacy of the National authority, or the just rights of citizens under the Constitution, are, in general, to be treated as valid and binding. The existence of a state of insurrection and war did not loosen the bonds of society, or do away with civil government, or the regular administration of the laws. Order was to be preserved, police regulations maintained, crime prosecuted, property protected, contracts enforced, marriages celebrated, estates settled, and the transfer and descent of property regulated precisely as in time of peace. No one that we are aware of seriously questions the validity of judicial or legislative acts in the insurrectionary States touching these and kindred subjects, where they were not hostile in their purpose or mode of enforcement to the authority of the National government, and did not impair the rights of citizens under the Constitution. The validity of the action of the probate court of Alabama in the present case in the settlement of the accounts of the executor we do not question, except so far as it approves the investment of funds received by him in Confederate bonds, and directs payment to the legatees of their distributive shares in these bonds. Its action in this respect was an absolute nullity, and can afford no protection to the executor in the courts of the United States."

A month before the Civil War commenced in Virginia, plaintiff in Williams v. Bruffy,[71] who lived in Pennsylvania, sold goods to defendant in Virginia. Under a law of the Confederate States this debt was sequestered and defendant paid it to the Confederacy. The payment was held no discharge and plaintiffs had judgment. Mr. Justice Field said, "It would be a strange thing if the nation, after succeeding in suppressing the rebellion and re-establishing its authority over the insurrectionary district, should, by any of its tribunals, recognize as valid the attempt of the rebellious organization to confiscate a debt due to a loyal citizen as a penalty for his loyalty. Such a thing would be unprecedented in the history of unsuccessful rebellions, and would rest upon no just principle."

The American Revolutionary War gave rise to several English court decisions concerning the acts of the American government in rebellion. One important English case, Ogden v. Folliott, which arose out of the American Revolution, is discussed in this opinion, infra, commencing at the point to which note 93 is appended. The result of these cases is stated by McNair:[72] "In spite of some wavering the main principle is, we think, clear, namely, that an English Court will not recognize, and give effect to the official acts, legislative or otherwise, of a Government in rebellion against His Majesty. Whether this reference would extend to ordinary routine acts such as the granting of probate of wills, or judgments in suits between parties concerning matters not connected with the rebellion, does not appear to have called for decision."

## II

The foregoing references have been directed to the first question in this case, but, it must be obvious, that they also go a long way toward answering the second. They help to measure the differences between the two, and to illuminate the distinction. The acts of the belligerent occupant are valid which benefit and protect the inhabitants. And, so too are his acts which provide against the unnecessarily severe derangement of the ordinary pursuits and business of society.

On the other hand, those acts of the belligerent occupant are not valid which are directed by the enemy against this nation or its citizens, are obnoxious to our ideas, and are intended primarily to

---

71. 1877, 96 U.S. 176, 188, 24 L.Ed. 716. See also, Dewing v. Perdicaries, 96 U.S. 193, 24 L.Ed. 654.

72. Legal Effects of War, pp. 348–350.

aid his efforts to put us down. The acts of the occupant must not offend *ordre public.*

No principle, either of international or municipal law, requires a United States court to hold otherwise. From an international law point of view this court may hold the Japanese decree against this traffic in money inoperative upon any one of three possible grounds:

First, we are free under international law to choose our own theories of conflict of laws, and, that is particularly true, where the acts to which we refuse recognition are the acts of an enemy. Even neutral sovereign states enjoy considerable latitude in the solution of their own conflict-in-law problems according to their own choice of theories. *A fortiori,* that is true of a sovereign which is an ally of the occupied state, and which had as close a relationship to the Philippines as we had in 1942, in a war against the common enemy. It must be remembered that in this decision we are required to go back into war time relationships.

Feilchenfeld, in his analysis and summary of the international law of belligerent occupation says, the occupied state "may certainly go as far as it pleases in refusing recognition to acts of its enemy. * * * the degree of benevolence exercised by a sovereign toward its own people, is according to present rules of international law, a domestic and not an international matter." (sec. 460) "Rescission measures of returning sovereigns," Feilchenfeld says, "will be bound to involve inhabitants more frequently and more directly than they will involve the former occupant. Going to extremes in such a policy will invariably do more harm to the sovereign's own population than to the enemy. This aspect frequently has been stressed by the greatest and soundest authorities on the law of occupation. Where, as is true in the majority of cases, relationships between the sovereign's own subjects are concerned, only problems of domestic law will be raised."

This is true whether the question under consideration is: the extra-territorial effect of occupation measures in an unoccupied area,[73] or the effects of measures of absent sovereigns in the occupied area,[74] or, the recognition of occupation measures by third states,[75] or, to what extent neutral countries will recognize laws of absentee sovereigns for regions which they do not control,[76], or, non-recognition by an ally of the occupied state,[77] or, the far-reaching rescinding power of a returning sovereign.[78]

Problems of *postliminii* are governed by ordinary municipal law, *droit commun;* according to Niboyet.[79]

Second, the Japanese regulation in question was *ultra vires,* because the power to make it cannot be found in, or deduced from the Hague Regulations, and, they are the measure of international legality.

"In regard to occupation decrees issued under general police powers, decisions rendered by occupation tribunals, or other authorities and relationships created or modified between private individuals," Feilchenfeld says, "there has been a sound and strong tendency to distinguish between 'permitted' acts and acts not meeting the requirements of international legality. The former will normally be upheld, while the latter will be refused recognition."[80]

73. Feilchenfeld, supra, secs. 457-460, 460.

74. Id., secs. 461-472, 466.

75. Id., secs. 475-480, 476-477.

76. Id., secs. 481-484, 482-483.

77. Id., secs. 486-487.

78. id, secs. 490-502, 496, 497, 502.

79. "De l'effet en pays neutre des mesures de guerre telles que sequestres," etc. *Revue de droit international prive et de droit penal international,* Vol. XVI (1920), pp. 248-257.

80. supra, sec. 496. In section 497, Feilchenfeld refers to the "wise advice" of Pillet, Les lois actuelles de la guerre, 2nd ed. pp. 255-256, and Spaight, War Rights on Land, pp. 366-367: "Leading English and French writers before 1914 were opposed to the application of postliminy to permitted acts of occupants. Pillet believes that the laws, decrees, and law court decisions of an occupant should be regarded as good and valid by the returning sovereign. According to Pillet, social life would be paralyzed if people knew

It is believed that we should not recognize occupation measures of the hostile kind involved in this case, and that the distinction we have attempted to spell out is the dominant distinction in the decisions and practice.

During the War of 1914–1918, Belgium was subjected to a regulated economy through German occupation decrees governing a detailed variety of subjects. The Belgian courts, after the war, furnish us with instances of both recognition and non-recognition of the German occupant's decrees, which further illustrate the distinction. These courts upheld the German regulations aimed at ensuring a supply and reducing the prices of commodities,[81] but held invalid those German occupation regulations which were beyond the scope of authority conferred by the Hague Regulations, because not supported by either military necessity or the necessity of maintaining public order.[82] For example, in Bochart v. Committee of Supplies of Corneux, the Court of Appeal of Liege upheld a German decree regulating and trying to reduce the exorbitant price of vegetables.

And, in City of Maline v. Societe Centrale pour l'Exploitation du Gaz, the Court of Appeal of Brussels upheld a German decree increasing the cost of supplying gas, holding that, "the circumstances of war time, and particularly the increase in the cost of raw materials and the necessity for providing for the needs of the population, in fact justified the measures taken by the occupying authorities."

On the other hand, the Court of Appeal of Brussels, in De Brabant and Gosselin, v. T. and A. Florant, refused to uphold a German order because it had been issued in order to starve the population and had gone beyond Article 43, and could not void an agreement properly concluded by the parties. And, similarly, in City of Antwerp v. Germany, the court refused to give effect to a decree of the German governor-general of Antwerp affecting the responsibility of municipalities for acts of violence by mobs against persons and property.

By the use of these illustrations we do not mean to be understood as adopting the extreme Belgian school,[83] for these illustrations do not fall within it.

that the end of hostilities would mean a fatal dissolution of all results of the occupation, and it is in the interest of the 'unfortunate' populations that a returning sovereign should refrain from upsetting all measures taken by an occupant. Spaight follows a similar line and points out that no one would enter into any legal relations during an occupation if such legal relations were to be nullified the moment the occupation ceased, and that such nullification would be unjust to the individual inhabitants and 'impolitic as regards the community at large.' However, Spaight applies his theory only to lawful measures of an occupant, not to illegal measures and excesses of jurisdiction: 'If the legal government were obliged to recognize the continuing effects of any act of administration carried out under an occupant's authority, a few weeks' occupation might possibly result in servitudes being set up or obligations undertaken, which would prejudice the legal government for a generation.' Spaight also points out that certainly the returning sovereign is not called upon to recognize purely political acts of the occupant or judicial sentences inflicted for such military offenses as war treason.' But subject to these limitations, Spaight

is in agreement with Pillet that the acts of an occupant 'are entitled to respect and the fact that they are acts done by an enemy does not impair their validity.' "

81. (Court of Appeal of Brussels) City of Maline v. Societe Centrale pour l'Exploitation du Gaz', Annual Digest, 1925–26, Case No. 362; (Court of Appeal of Liege) Bochart v. Committee of Supplies of Corneux, Annual Digest, 1919–1922, Case No. 327; (District Court of Rotterdam) Cillekens v. De Haas, Annual Digest, 1919–1922, Case No. 336.

82. (German-Belgian Mixed Arbitral Tribunal) City of Antwerp v. Germany, Annual Digest, 1925–26, Case No. 361; (Belgian Court of Cassation) Commune of Grace-Berleur v. Colliery of Gosson Lagasse, Annual Digest, 1919–1922, Case No. 326; (Court of Appeal of Liege) Mathot v. Longue, Annual Digest, 1919–1922, Case No. 329; (Court of Appeal of Brussels) De Brabant and Gosselin v. T. and A. Florant, Annual Digest 1919–1922, Case No. 328. See McNair, pp. 321–322, Oppenheim, 6th ed. Vol. II, pp. 341–43, sec. 169, Note 5, and Feilchenfeld, supra, secs. 498–499, and notes.

83. Feilchenfeld, supra, pp. 134, 136 ff., 142, and 147 ff.

625

In all of the cases[84] dealing with the extra-territorial effect of enemy property legislation it is held that such legislation can have no extra-territorial effects. These decisions also support the distinction we make for they are based upon the hostile and spoliatory character of the measures.[85]

Third, we may refuse recognition to all measures taken by Japan in violation of the rules of international law.[86] The notes in question and the traffic in money out of which they arose were the direct, if not inevitable result of the starvation and ill-treatment of our people who were Japanese prisoners of war.

At the very least the Japanese army violated Articles 4 and 7 of the Hague Regulations, 36 Stats. Part 2, pp. 2296–97 in their treatment of these prisoners, and violated the corresponding improved and elaborated provisions, Articles 2, 4, and 11, (47 Stats. Part 2, pp. 2031 and 2034) of the Geneva Convention of July 27, 1929, Relative to the Treatment of Prisoners of War. Prisoners of war "must at all times be humanely treated and protected against acts of violence * * *." The detaining power "is bound to provide for their (prisoners') maintenance." "The food ration of prisoners of war shall be equal in quantity and quality to that of troops at base camps;" and "prisoners shall receive facilities for preparing, themselves, additional food which they might have."

The edict in question was an implementation of the policy, and a further attempt on the part of the Japanese, to starve and torture our people in an intolerable and internationally illegal manner.

III

We turn now to an examination of the municipal law which we deem to be ap- plicable. And, at once, it is clear that the principle of Conflict of Laws relied upon by the defendant does not apply, for it is subject to two important qualifications, within both of which his defense falls.

Professor Williston states them:[87] "The Restatement of Conflict of Laws states that the legality of a contract depends upon the law of the place where it is made; but this statement is qualified by the further provision that if the performance is illegal at the place of performance, there is no obligation to perform. Under this view, if the bargain is illegal (as distinguished from merely unenforceable) where made, it is usually invalid everywhere, and if valid where made, it is generally enforceable everywhere, subject to the performance not being illegal where due. It is also subject to the rule that no state will enforce a bargain, though valid where made and where performable, if the enforcement of the particular right claimed to arise therefrom is contrary to a strong public policy of the forum."

Many authorities are cited by the author in a note to this passage. The rule is first subject to the qualification that performance must not be illegal where due. And, second it is subject to the principle "that no state will enforce a bargain, * * * if the enforcement of the particular right claimed to arise therefrom is contrary to a strong public policy of the forum."

Where was performance due on these notes? Price had no funds in the Philippines. He was imprisoned in an enemy war prison camp. He had no estate and was dependent solely upon his salary as national bank examiner. This was all disclosed to the bank representative Brady. When the Japanese struck, defendant had

84. Listed by Niboyet, *Revue de droit international prive et le droit penal international,* Vol. XVI (1920), pp. 248–257.

85. Feilchenfeld, sec. 477.

86. Feilchenfeld, sec. 458, and sec. 87, note 3: "The law of occupation shared and still shares with other parts of international law its most general and fatal weakness; there may be legitimate de- viations from the rules if the other side violates international law. So long as there are no wartime tribunals of an international kind, it is in practice left to every state to decide whether it wants to assert that the other side has engaged in violations."

87. Williston on Contracts, rev. ed., sec. 1792; American Law Institute, Restatement on Conflict of Laws, sec. 332, 347; Beale, Conflict of Laws, secs. 332, 347.

finished his work in the Philippines and was about ready to return to the United States. The notes themselves provide for a rate of exchange in United States dollars. They could not be paid until Price rehabilitated himself at home. His employment as national bank examiner necessarily would take him back to the United States, if he survived his imprisonment. If he did not survive the claim would have to be presented against his estate in the United States. The circumstances show that the parties to these notes intended that they should be enforced in the courts of the United States. This is the place of performance.

■ Performance of the obligation of these notes is not illegal in the United States. It is the assertion of a defense and the failure to perform in reliance upon a Japanese penal decree, which violates our most deeply held views of conscientious conduct, and sound public policy. The principle is the same. Whether asked to enforce rights, where performance here is illegal, or to allow a defense where it is here illegal, this court should not take the absurd position, after we have fought a war to put an enemy down, that it will give effect to the invader's decrees directed against our citizens. Such position does not make sense to me. This case falls within Williston's first and second qualifications of the rule, that the legality of a contract depends upon the laws of the place where made.

This is the kind of defense, in Williston's language, which is "not merely contrary to the public policy of the forum, but distinctly pernicious thereto", quoting Cardozo, J., in Loucks v. Standard Oil Co.[88] Thus in Greenwood v. Curtis,[89] the Supreme Judicial Court of abolitionist Massachusetts refused recovery upon a note promising to deliver a number of slaves, because to enforce it would aid a bargain deemed vicious and immoral at the forum. Lord Dunedin, in Dynamit Actien-Gesellschaft and Vereinigte Koenigs and Laura-

huette Actien-Gesellschaft v. Rio Tinto Co.[90] puts the conflict of laws matter thus: "It is illegal for a British subject to become bound in a manner which sins against the public policy of the King's realm."

## IV

■ In a very real and substantial sense, we would be recognizing and giving effect to the penal laws of the Japanese Military Government of the Philippines, were we to sustain defendant's claim. Defendant invokes the Japanese edict against the kind of traffic out of which these notes arose. He stipulates that such traffic was punishable by death. Founding his claim upon it, he urges that the edict renders the notes invalid. There is an additional ground, therefore, upon which we might rest our refusal to allow his defense. Chief Justice Marshall tersely stated it in The Antelope,[91] "The courts of no country execute the penal laws of another". Mr. Justice Gray examined it at length in Huntington v. Attrill.[92] Upon the question what are to be considered penal laws of one country, within the international rule which forbids such laws to be enforced in any other country, Mr. Justice Gray said: "The question whether a statute of one state, which in some aspects may be called penal, is a penal law in the international sense, so that it cannot be enforced in the courts of another state, depends upon the question whether its purpose is to punish an offense against the public justice of the state, or to afford a private remedy to the person injured by the wrongful act."

There can be no doubt the purpose of the Japanese edict was to punish. But, whether the incident or consequence of that edict, as defendant claims, that these notes are invalid, is strictly penal so as to have no extra-territorial operation, was not argued and is not necessary to this decision. For want of such argument, I shall not express an opinion upon the point, though it is an interesting one, and shall content myself with one additional reference. Ogden v.

88. See, supra, Note 2.

89. 6 Mass. 358, 4 Am.Dec. 145.

90. 1918, A.C. 260, at page 294.

91. 1825, 10 Wheat. 66, 123, 6 L.Ed. 268.

92. 1892, 146 U.S. 657, 13 S.Ct. 224, 36 L.Ed. 1123.

Folliott[93] argued in Common Pleas, in the King's Bench on writ of error, and in the House of Lords, has been regarded for over a century and a half as a leading authority for the proposition that an English court will not enforce a penal law of a foreign state.

George Folliott and David Ogden were British subjects who lived in the colonies of New York and New Jersey before the American Revolution. In 1769 Folliott loaned Ogden some money which he agreed under seal to repay. During the Revolutionary War, i. e., in 1779, both were attained by the Acts of Confiscation of their respective revolutionary states, for adhering to the enemy, and their property forfeited to the people. They both fled to England, where Folliott brought debt upon the bond against Ogden in the Court of Common Pleas.

If the English court were to consider the Act of Confiscation of the State of New York as binding, such Act divested Folliott of his property in the bond and disabled him to sue on it.

The Court of Common Pleas, gave judgment for the plaintiff, Folliott, on the ground that "the penal laws of foreign countries are strictly local".

The Court of King's Bench affirmed the judgment. Buller, J., relied on the "general principle, that the penal laws of one country cannot be taken notice of in another. Then apply that principle to the present case: This is an action on a bond, to which the defendant has pleaded that by the penal laws of another country the property of the plaintiff in the bond has been devested out of him: but this court cannot take notice of that defence * * *." And, Grose, J., said: "It has been correctly stated by my brother Buller, that the penal laws of one country cannot affect the laws and rights of citizens of another."

Lord Kenyon with whom Ashhurst, J., concurred affirmed the judgment on a different ground: that the New York Act of Attainder and Confiscation was a nullity, as an act of "open rebellion against the King", and inoperative against British subjects. Lord Kenyon's language is: "* * * but thus it stands; in 1779 that province set about a reform and to assert what is called their rights, but which I, sitting here, am bound to say was an act of rebellion against the sovereign power of the State, and that their act was illegal at that time, whatever confirmation it might afterwards receive there by the subsequent treaty of peace. Then when these parties came into this country before the independence of America was acknowledged, was their property confiscated? Could it have been pleaded here to an action brought at that time that those States had made what they called a law, forfeiting the property of those who adhered to the Government of this country? Certainly not. And yet as between these parties they must be understood to be in the same situation now as at that time; for, whatever operation the treaty of peace might have on the persons resident in that country, it is impossible to say that it was intended to, or did, give effect to the Acts of the Assembly by which the property of our own subjects resident here was confiscated. The consequence of the argument for the plaintiff in error would be, that every act done by the loyalists in America previous to the treaty of peace was admitted by that treaty to be an act of high treason against the State of New York: but that can never be supported * * * I am therefore most clearly of opinion that the Act of Confiscation which passed 1779 cannot be considered in this country as competent to transfer the property of Folliott to any person whomsoever; and consequently that the right of action, which accompanied him when he came into this country, is not devested out of him."

Grose, J., characterized the New York Act of Confiscation as "an Act, which at the time it passed was considered as mere waste paper, or, if it were of any avail, was an Act of Treason."

93. 1789, 1 H.Bl. 123; 1790, 3 T.R. 726; 1792, Bro.Parl.Cas. 111.
See McNair, supra, pp. 348–349.

The speeches in the House of Lords are not reported; however, the judgment for plaintiff Folliott was affirmed. And, the first argument advanced in the House of Lords for defendant was that "no assumed Act of legislation by the colonies of North America, while in a state of rebellion against His Majesty, can legally affect the rights of any subject of this realm."

The judgment of the Court of King's Bench, and, perhaps, that of the House of Lords, give support to the proposition that the Japanese edict against traffic in money was penal so as to have no extra-territorial effect upon the notes. In Ogden v. Folliott the English court refused to give the effect to the New York Act of Confiscation that it transferred the property in the bond from the obligee to the State of New York. In the case at bar we refuse to give the effect to the Japanese edict against traffic in money that it invalidates the notes in suit. At least, the English case furnishes us a very close analogy of high authority.

Of much more importance and interest here, however, is the fact that the judgments of Chief Justice Kenyon, Ashhurst, J., and Grose, J., in Ogden v. Folliott, and, as well the argument before the House of Lords, recognize the principle upon which I rest my decision in this case, namely, that unconscionable acts of an enemy belligerent occupant directed against our citizens have no validity in our courts.[94]

### V

■ There is still another ground upon which we may rest the decision we reach in the case at bar. The notes sued upon were given to secure money with which to supply the maker, who was interned by the enemy, with the necessaries of life. There is common law authority that a contract entered into for the humanitarian object of supplying the needs of a British prisoner of war is enforceable in English courts after the war, even though it involved (which the present case does not) intercourse during the war between persons in the enemy country and in England.[95]

In Antoine v. Morshead, a bill of exchange was drawn on the defendant in England by his father, a British subject held prisoner in France during a war between England and France. It was payable to another British subject also held prisoner, who, afterwards, indorsed it to the plaintiff, a French subject, who was a banker at Verdun, and accepted by the defendant. The plaintiff recovered upon the bill at the end of the war. Chief Justice Gibbs observed, " * * * the drawer might legally draw such a bill for his subsistence, (otherwise) * * * many of our miserable fellow-subjects detained in France must have starved." Chambre, J. * * * "I am perfectly of the same opinion, and it would be of very mischievous consequences if it were otherwise".

■ One further matter of which, perhaps, a word should be said is: The suggestion has been made that inequity and injustice will result to defendant because he received "Mickey Mouse" Japanese fiat war money for these notes, and now, must repay good hard American dollars.[96] The answer to that, I think, is that defendant received in full that for which he bargained, and at the time such fiat money was of great value to him. The Japanese war notes were issued as legal tender at par with the Philippine peso, and were guaranteed by the Japanese Imperial Gov-

---

94. Dicey, Conflict of Laws, 5th ed. p. 536, note (a). McNair, supra, pp. 348–349. See, also, Barclay v. Russell, 1797, 3 Ves.Jr. 424, explained in, 1805, 11 Ves. Jr. 283, 294. (Held no title to bank stock passed by virtue of act of legislature of revolutionary state of Maryland).

95. Antoine v. Morshead, 1815, Common Pleas, 6 Taunton 237; Daubuz v. Morshead, 1815, Common Pleas, 6 Taunton 332; Crawford and McLean v. The Wil-

liam Penn, 1819, Fed.Cas.No.3,373, 3 Wash.C.C. 484; Nelson v. Trigg, 3 Tenn. Cas., Shannon, 733. Cf. Willison v. Patteson, 1817, 7 Taunton 439. The cases are discussed by McNair, pp. 117–18, and by Trotter, Laws of Contract During and After War, 4th ed. 1940, pp. 26–27 and 346–348.

96. The Court of King's Bench, in Ogden v. Folliott, was not bothered at all by the fact that all of defendant's property had been confiscated.

ernment in its Proclamation of January 3, 1942, and February 1, 1942, in which that government said of the notes, that it "takes full responsibility for their usage, having the correct amount to back them up."[97] If defendant cannot get compensation through a claim against the Japanese government, if any he has, he will have to suffer, as everyone else does the losses incident to all wars.

In conclusion, as one writes, he cannot escape the consciousness that there is at present a new wave of unrest which seems about to engulf the world again in wars. Our armed forces are now in many foreign lands and those of enemy nations, before long, might occupy some part of our own territory. The principles of the law of belligerent occupation assume a larger importance in this view of events, and might become of quite considerable moment.

97. O. T., IMA Vol. I, pp. 39–40; Haw Pia v. China Bank, supra.